COMMONWEALTH of Kentucky, Appellant,

v.

Othaniel Cantrell NOURSE, Appellee,

and

Othaniel Cantrell Nourse, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2003–SC–0220–MR, 2003–SC–0221–MR.

Supreme Court of Kentucky.

Sept. 22, 2005.

Rehearing Denied Dec. 22, 2005.

Lisa Bridges Clare, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for Appellant.

Gregory D. Stumbo, Attorney General, Ian G. Sonego, Charles R. Orange, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, for Appellee.

Opinion of the Court by Justice
GRAVES.

A jury of the Logan County Circuit Court convicted Appellant, Othaniel Cantrell Nourse, of complicity to murder, tampering with physical evidence, possession of a handgun by a convicted felon, and of being a second degree persistent felony offender. Subsequent to the guilty verdict but prior to sentencing, Nourse moved for judgment notwithstanding the verdict ("JNOV"). The trial court granted the JNOV with respect to the complicity to murder conviction, but denied the motion as to the other convictions. Appellant was sentenced to not more than twenty (20) years imprisonment for the remaining convictions. Both the Commonwealth and Appellant now appeal to this Court as a matter of right. Ky. Const. § 110(2)(b). For the reasons set forth herein, we affirm.

The crimes with which Appellant was convicted stemmed from an early Christmas morning murder and robbery. The evidence presented at trial tended to show the following: between 1:30 a.m. and 2:00 a.m. on the night of December 25, 2001, Denarrius Terry knocked on the apartment door where Appellant and his girlfriend were living. Appellant's girlfriend, Julie Bogel, testified that she and Appellant were awakened by the knocking. Appellant eventually answered the door and after a brief discussion, he gave Terry possession of his handgun, which he kept between the mattresses in the bed.

About thirty minutes later, Terry returned to the apartment and knocked on the door. Bogel testified that Appellant again got up to answer the door. She stated that upon answering the door, he quickly returned to the room and placed something in the dresser drawer. Shortly after that, Bogel stated that Appellant returned to the room again, got dressed, and then displayed bullet cartridge shells which were resting in his hand. Appellant told Bogel that he needed to dispose of the casings and then left the house for about fifteen minutes. Appellant later told police that he threw the spent casings down a storm drain.

At some point, Bogel said that she heard someone (later identified as Terry) enter the residence. She stated that she then heard Appellant return to the apartment and state, "Cuz', you got it lit up like the Fourth of July down there" (presumably referring to emergency vehicles located outside the scene of the murder). Bogel testified that she had known Appellant to refer to Terry as his cousin. Bogel went on to state that she observed Appellant go into the bathroom and wash blood off sev-

eral dollar bills, later putting the bills on the window sill to dry. Bogel testified that Appellant told her that Terry gave him money for use of the gun. Appellant conceded in his statement that Terry had given him $90, but claimed the money was for marijuana.

Bogel went on to testify that later the next night, Appellant told her that Terry needed the gun because he had been robbed while playing dice or gambling. Appellant went on to explain that Terry killed the robber. In a taped statement, Appellant stated that when Terry first came to the door, Terry told him only that he wanted to borrow the gun to go shooting in the country. Appellant further stated that Terry did not tell him what actually happened until after he disposed of the casings. Terry had, in fact, used Appellant's gun to murder and rob a man at a private gambling club. The murder was allegedly triggered by Terry's repeated gambling losses to the victim. Further evidence was presented at trial and shall be developed herein as necessary.

The jury convicted Appellant of all charges submitted to it; however, the trial court granted Appellant's post trial motion for JNOV with respect to the complicity to murder conviction. Appellant now appeals his remaining convictions to this Court, and the Commonwealth cross-appeals the trial court's order vacating Appellant's conviction of complicity to murder.

## I. APPELLANT'S APPEAL

Appellant's primary argument on appeal is that the trial court erred when it denied his motion to suppress evidence generated from the warrantless search of Julie Bogel's apartment. He claims the search was conducted in violation of his rights under both the United States and the Kentucky Constitutions to be free of unreasonable searches. U.S. Const. amend. IV and XIV; Ky. Const. § 10. For the reasons set forth herein, we disagree.

In August 2002, some eight months after the murder, Sergeant Barry Dill of the Russellville Police Department received a telephone call from an unidentified woman. The woman purported to give information regarding the location of a weapon that was used to commit a murder in a gambling club on December 25, 2001. The woman stated further that the weapon was in the possession of either Heather Warden (Appellant's girlfriend at the time, but now wife) or Appellant. The woman called Sergeant Dill a second time and stated that Appellant and his girlfriend were staying at an apartment at 910 Gilbert Street. Sergeant Dill then discovered that Appellant had an outstanding warrant for his arrest.

Based on this information, Sergeant Dill, Officer Ann Phelps, and Officer Troy Robinson proceeded to take steps to serve the arrest warrant on Appellant. Officer Phelps stated that she was familiar with the apartment and had served another unrelated arrest warrant on Appellant at the same address just two or three weeks prior. Officer Phelps further testified that she was informed that two other telephone calls (in addition to the telephone call received from the anonymous tipster) also verified the location of Appellant. Upon arriving at the Gilbert Street address, which was a public housing complex, the officers contacted the Housing Authority Director, Jack McLean (a.k.a. the landlord). McLean informed the officers that the apartment should be vacant because the lessee, Julie Bogel, was being or had been (the testimony is not clear) evicted. The officers told McLean that they had information that people were residing at the apartment. McLean then indicated to the officers that if anyone should be in the apartment, they would be trespassing.

Based on the information provided by McLean, the officers and McLean proceeded to check out the apartment. They knocked loudly on the door for several minutes and received no answer. Upon receiving no answer, McLean attempted to open the door with his pass key. Once the door was partially open, they heard a baby crying inside the apartment. Eventually, a woman (later identified as Heather Warden) came to the door and unhinged the inside chain which prevented the door from opening completely. Warden (now married to Appellant) testified that her two young children were present in the apartment at that time and that she was in her bathrobe when she answered the door. Officer Robinson testified that when he asked Warden where Appellant could be found, she motioned to him that Appellant was at the back of the apartment. Appellant was then apprehended, taken into custody, and removed from the apartment.

After Appellant was removed from the apartment, Officer Robinson testified that he asked and received consent from both McLean (the landlord) and Heather Warden to search the apartment. Warden testified that she did not actually give consent to Officer Robinson, but did admit signing a statement to the contrary. Officer Robinson testified that he believed neither Warden nor Appellant had a right to be in the apartment, but that he asked for Warden's consent as a precaution. Among other things, Robinson's search of the apartment produced the gun used to murder the victim.

Bogel testified that she had not actually been evicted at the time of the search, but had only received a notice of eviction. She also testified that she broke up with Appellant some time in June 2002 and had moved out of the apartment at that time. She stated that she removed her clothes, but left her furniture at the apartment.

She further stated that she gave permission to Appellant to continue to live in the apartment, despite the fact that her lease did not permit her to sublease the apartment. Warden testified that she did not actually live at the apartment, but that she simply stayed the night on occasion as a houseguest. However, Warden admitted that she was present at the apartment several weeks earlier, with her children, when Appellant was served with a warrant at that location in an unrelated matter.

The trial court found Officer Robinson's conduct to be permissible, ruling that it was reasonable for him to rely on the consent of both McLean and Warden as authority to conduct the search. He went on to find that it was reasonable for police to believe that Appellant and Warden were essentially "squatters," ruling that "squatters" have no reasonable expectation of privacy in the place where they are "squatting."

Appellant points out that he was not actually a "squatter" because Julie Bogel had not been evicted at the time of the search. Therefore, Julie Bogel still had a right to occupy the apartment up and until the date of actual eviction. *See Clay v. Terrill*, 670 S.W.2d 492, 493 (Ky.App.1984) (tenant has right to possess apartment until date of actual order of eviction). Since Julie Bogel had a right to be in the apartment, she had the ability to transfer actual possession of the apartment to Appellant (even though her lease was subject to immediate termination for doing so) or at the very least, allow him to stay in the apartment as a houseguest. Once Appellant achieved the minimum status of houseguest, he had a legitimate expectation of privacy in the premises. *See Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

Even if Appellant had a legitimate expectation of privacy in the premises, the

Commonwealth argues that the search was nonetheless constitutional based on Officer Robinson's reasonable belief that he had been given consent to search. In *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), the United States Supreme Court stated, "There are various elements, of course, that can make a [warrantless] search of a person's house reasonable—one of which is the consent of the person *or his cotenant." Id.* at 183–4, 110 S.Ct. at 2797 (emphasis added). Because it was reasonable for Officer Robinson to believe that Heather Warden was a cotenant of the apartment, we agree with the Commonwealth that the search of Julie Bogel's apartment was constitutional.

■ In this case, neither Julie Bogel nor Appellant gave consent to search the premises, but rather third parties gave consent to search—namely, Heather Warden and the landlord, Jack McLean. The test for whether third-party consent is valid is whether a reasonable police officer faced with the prevailing facts reasonably believed that the consenting party had common authority over the premises to be searched. *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir.2004) ("Even if a third party does not possess actual common authority over the area that was searched, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search."); *see also, Rodriguez, supra.*

Officer Robinson testified that he relied on the landlord's statement that any person inside the apartment was a trespasser since the lessee, Julie Bogel, had been or was being evicted (the testimony is unclear as to what the landlord actually told the officers). Officer Robinson further stated that he obtained Warden's consent as a precaution (presumably, because he wanted to preserve the legality of the search in

case he was wrong about assuming that McLean had authority to consent).

■ These facts present two distinct questions of law: (1) whether it was reasonable for the officers to believe that the landlord had authority over the premises; and (2) if it was unreasonable for the officers to believe that the landlord had authority over the premises, did the consent of Heather Warden rectify the initial error? This Court's inquiry into the reasonableness of a warrantless search "must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez, supra* at 189, 110 S.Ct. at 2801 (citation and quotations omitted). Because we ultimately find that the facts available to the officers at the moment of the search would warrant a reasonable person to believe that Heather Warden had common authority over the apartment, we need not determine whether or not it was reasonable for the officers to believe that the landlord had authority over the premises.

The facts available to the officers at the time of the search were these: they had an anonymous tip that Appellant was residing at 910 Gilbert Street with his girlfriend. When they arrived at 910 Gilbert Street, the tip was corroborated to the extent that they found Appellant and his girlfriend (now wife), Heather Warden, in the apartment. Warden testified that both of her young children were at the apartment at the time the officers knocked on the door and that she was in her bathrobe. She further testified that she was at the apartment two or three weeks prior when Officer Phelps served an unrelated warrant on Appellant. Finally, the evidence established that Warden signed a statement giving her express consent to search the apartment.

In *United States v. Matlock,* 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974), the United States Supreme Court stated that "[c]ommon authority rests on mutual use of the property by persons generally having joint access or control for most purposes. . . ." The Court stated that "common authority is, of course, *not to be implied from the mere property interest a third party has in the property,*" nor does it "rest upon the law of property with its attendant historical and legal refinements." *Id.* at 171, n. 7, 94 S.Ct. at 993 n. 7 (citing *Chapman v. United States,* 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another even though landlord had legal authority to access home) and *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel clerk could not validly consent to search of customer's room even though clerk had legal authority to access room)). Rather, the Court explained that the concept of common authority is meant to rest on the premise that any cohabitant "has the right to permit the inspection [of his living space] in his own right and that the other [cohabitants] have assumed the risk that one of their number might permit the common area to be searched." *Id.*

Since the holding in *Matlock,* courts have repeatedly held that the proper inquiry for police when determining if a third party has authority to consent to the search of a residence is not whether the third party has legal authority to enter or control the residence, but whether it is reasonable to believe that the third party actually lives at, has general access to, and/or possesses mutual use of the residence for most purposes. *See Rodriguez, supra,* at 186, 110 S.Ct. at 2800 (United States Constitution is not violated when officers enter a premise if they reasonably believe "that the person who has consent-

ed to their entry is a resident of the premises"); *Trulock v. Freeh,* 275 F.3d 391, 403 (4th Cir.2001) ("Authority to consent originates not from a mere property interest, but instead from mutual use of the property by persons generally having joint access or control for most purposes . . . ."); *United States v. Gillis,* 358 F.3d 386, 390 (6th Cir.2004)(same); *United States v. Clutter,* 914 F.2d 775, 777–778 (6th Cir.1990) (defendant's twelve and fourteen year old children were competent to give consent to search because "in common experience family members have the run of the house"); *United States v. Reeves,* 594 F.2d 536, 539 (6th Cir.1979) (apparent cotenant of apartment who was unrelated to suspect had common authority to permit search of suspect's room); *United States v. Kimoana,* 383 F.3d 1215, 1222 (10th Cir.2004) (consent to search valid even though person who consented to a search of the motel room was not the "registered renter" of the room); *State v. Vazquez,* 87 Conn.App. 792, 867 A.2d 15, 22–23 (2005) (suspect's girlfriend who apparently lived in home and whose children were present when the police arrived had common authority to permit search of home even though police knew that the phone number registered to the home was only in the suspect's name); *People v. Mahaffey,* 166 Ill.2d 1, 209 Ill. Dec. 607, 651 N.E.2d 1055, 1065 (1995) (it was reasonable for police to presume that person was a cotenant and thus, had common authority over the premises to consent to a search where person answered the door during the early morning hours, directed the officers to where the suspect was in the home, and signed a form consenting to a search of the home).

Two decisions worthy of particular note in this case are *United States v. Jenkins,* 92 F.3d 430 (6th Cir.1996) and *State v. Lambert,* 134 Or.App. 148, 894 P.2d 1189 (1995). In *Jenkins,* the United States

Court of Appeals for the Sixth Circuit stated that in the absence of additional information to the contrary, it is generally considered reasonable for police officers to presume that persons answering knocks at the door of a residence have authority to consent to a search of that residence. *Id.* at 437. In *Lambert,* the Oregon Court of Appeals found that a woman who answered the door and who claimed that she lived at the apartment was competent to give consent to search the apartment *even though she was not a party to the rental agreement and did not have authority under the lease to reside in the apartment. Id.* at 1191–92. The Oregon Appeals Court stated that being "subject to eviction" had no bearing on whether the woman possessed "joint access to and control of the premises for most purposes ...." *Id.*

When considered in light of competing policy considerations pertaining to the Fourth Amendment (ensuring workability for officers making snap decisions in the field versus discouraging unnecessary warrantless searches), we find the totality of the circumstances in this case favor deeming the warrantless search of Bogel's apartment reasonable. Officer Robinson believed that Appellant and Warden were trespassers. However, as a precaution, he nevertheless obtained consent from an apparent resident of the apartment, Warden. Based on the facts available to Officer Robinson and his fellow officers at the time of the search, it was objectively reasonable for the officers to believe that Heather Warden had common authority over the apartment (despite the revelation, based on facts discovered after the search, that such authority was likely apparent and not actual). Accordingly, the trial court did not err when it denied Appellant's motion to suppress evidence obtained as a result of the warrantless search of Julie Bogel's apartment.

Appellant next argues there was insufficient evidence to convict him of tampering with physical evidence. When determining whether it was error for the trial court to submit a specific charge to the jury, this Court must determine whether the evidence, when considered in the light most favorable to the Commonwealth, is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty of each and every element of that crime. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

KRS 524.100 states as follows:

(1) A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:

(a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding; or

(b) Fabricates any physical evidence with intent that it be introduced in the official proceeding or offers any physical evidence, knowing it to be fabricated or altered.

Appellant contends there was insufficient evidence to establish that he believed that an official proceeding was pending or may be instituted when he disposed of the spent bullet casings. We find this argument to be completely without merit. The circumstantial evidence overwhelmingly suggests that Appellant knowingly tampered with physical evidence when he threw the spent bullet casings down the storm drain at 2:30 a.m. after lending his gun to a friend just thirty minutes earlier. *See Baker v. Commonwealth,* 860 S.W.2d 760, 761 (Ky.1993) (convictions may be obtained on the basis of circumstantial evidence). The fact that Appellant claims he

was unaware that a crime had actually occurred until after he threw the casings down the storm drain is unavailing since the jury is not required to believe self-serving statements from the defendant. *See Edmonds v. Commonwealth,* 906 S.W.2d 343, 347 (Ky.1995) (citing *Armstrong v. Commonwealth,* 517 S.W.2d 233, 235 (Ky.1975)).

## II. COMMONWEALTH'S CROSS-APPEAL

The Commonwealth appeals the trial court's JNOV order, which vacates the jury verdict finding Appellant guilty of complicity to murder. Ky. Const. § 115; *Commonwealth v. Brindley,* 724 S.W.2d 214, 216 (Ky.1986) (Commonwealth may appeal a JNOV order entered by the trial court in a criminal case). The trial court determined that Appellant could not be convicted of complicity to murder because the Commonwealth did not present sufficient evidence to establish that Appellant acted intentionally when he contributed to the death of the victim. The Commonwealth argues that the evidence was sufficient to infer that Appellant acted intentionally, however, even if the evidence is found to be insufficient, the trial court erred by not entering a conviction for the lesser included offense submitted to the jury, facilitation to murder.

When the trial court grants a JNOV in a criminal case on grounds of insufficient evidence, we utilize the standard of review employed by this Court in *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky.1991) for directed verdicts. *See Commonwealth v. Runion,* 873 S.W.2d 583, 585 (Ky.App. 1993), *disapproved on other grounds by Commonwealth v. Harrell,* 3 S.W.3d 349 (Ky.1999). *Benham, supra,* directs this Court to view the evidence in the light most favorable to the Commonwealth and from that portrayal, determine whether it is "sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty ...." *Id* at 187–88.

 In this case, the Commonwealth submitted a theory of complicity to murder pursuant to KRS 502.020(1). KRS 502.020(1) "applies when the principal actor's *conduct* constitutes the criminal offense." *Tharp v. Commonwealth,* 40 S.W.3d 356, 360 (Ky.2000) (emphasis in the original). Here, Terry's conduct, use of the gun to shoot the victim, constituted the criminal offense of murder. "[A] person can be guilty of 'complicity to the act' under KRS 502.020(1) only if he/she possesses the *intent* that the principal actor commit the criminal act." *Id.*

The Commonwealth argues that the evidence was sufficient to reasonably infer that Appellant intentionally promoted or facilitated the commission of the murder. We disagree. The record is devoid of any evidence establishing that Appellant intended to aid, promote or facilitate the actual shooting or murder of the victim. Indeed, the evidence established that Appellant did not even know the victim. After careful review, we agree with the trial court that the evidence, while sufficient to infer reckless or even wanton conduct on the part of Appellant, is not sufficient to infer intentional conduct pursuant to KRS 502.020(1).

 The Commonwealth argues, nonetheless, that even if the evidence was insufficient to prove complicity to murder pursuant to KRS 502.020(1), the trial court erred by failing to impose a conviction for the lesser included offense of criminal facilitation to intentional murder. KRS 506.080; *see Chumbler v. Commonwealth,* 905 S.W.2d 488, 499 (Ky.1995) (facilitation is a lesser included offense of complicity). For the reasons set forth below, we disagree.

One of the principal distinctions between facilitation and complicity is that "facilitation requires knowledge that another intends to commit a crime, while complicity requires an intention to promote or facilitate commission of the offense." *Skinner v. Commonwealth*, 864 S.W.2d 290, 298 (Ky.1993). Explained another way, "[f]acilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime." *Perdue v. Commonwealth*, 916 S.W.2d 148, 160 (Ky.1995). At first blush, it seems obvious that Appellant knew that Terry intended to commit some type of crime when he loaned his gun to Terry during those early morning hours. However, simple knowledge that *a crime* will be committed is not enough to satisfy the knowledge element for facilitation to intentional murder. *See Smith v. Commonwealth*, 722 S.W.2d 892, 896–97 (Ky.1987) (defendant not entitled to instruction on facilitation to rape and murder where he did not know about principal's intention to commit those particular crimes at the time he provided assistance to the principal), *see also Young v. Commonwealth*, 50 S.W.3d 148, 165 (Ky.2001) (evidence was sufficient to support conviction for criminal facilitation to murder where it was reasonable to infer from defendant's conduct that he had prior knowledge that principal intended to murder the victim). Rather, the Commonwealth must prove that Appellant had knowledge of the principal's intention to commit intentional murder, and with that knowledge, nonetheless, provided the principal with means to commit that crime. KRS 506.080 (commentary) ("To be guilty of the offense of facilitation, an individual must facilitate the commission of a crime that is actually committed."); *See also*, 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 10.17 (4th ed. Anderson 1993) (listing knowledge of crime that was actually committed as an essential element

of the offense). As discussed above, there is simply insufficient evidence to establish or infer that Terry told Appellant of his plan to intentionally murder the victim when he borrowed the gun from Appellant. While reckless or even wanton conduct on the part of Appellant may be inferred under these circumstances, knowledge about Terry's particular intentions at the time when Appellant loaned him the gun cannot be inferred from these facts. Thus, there was insufficient evidence to support either complicity or facilitation to intentional murder.

Appellant's convictions and sentences in the Logan County Circuit Court for Possession of a Handgun by a Convicted Felon, Tampering with Physical Evidence, and of being a Second–Degree Persistent Felony Offender are affirmed. The trial court's order setting aside Appellant's conviction for complicity to murder is affirmed.

LAMBERT, C.J., COOPER, GRAVES, JOHNSTONE, ROACH, and SCOTT, J.J. concur.

WINTERSHEIMER, J., concurs in part and dissents in part.