RENDERED:  DECEMBER 4, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1475-MR

COMMONWEALTH OF KENTUCKY                                    APPELLANT

v.          APPEAL FROM JEFFERSON CIRCUIT COURT
            HONORABLE OLU A. STEVENS, JUDGE
            ACTION NO. 17-CR-003409

JARRUS R. RANSOM                                              APPELLEE

OPINION
REVERSING

** ** ** ** **

BEFORE:  ACREE, KRAMER, AND TAYLOR, JUDGES.

ACREE, JUDGE:  The Commonwealth of Kentucky appeals from the Jefferson

Circuit Court's September 19, 2019 order granting, in part, Jarrus Ransom's

motion to suppress evidence obtained during a search of his residence.  After

careful review, we reverse.

## BACKGROUND

On October 7, 2016, Officer William Bower observed a vehicle driven by Ransom fail to use its turn signal on two separate occasions. The officer initiated a traffic stop and testified that upon approaching the vehicle to ask for Ransom's driver's license and auto registration, he immediately smelled marijuana. He was also familiar with Ransom. Specifically, he was aware that Ransom had been arrested previously and, at least once, had resisted officers arresting him.[1] (Video Recording (V.R.) 4/18/19; 8:59:09).

Due to the marijuana odor and his familiarity with Ransom, Officer Bower asked Ransom to exit the car and place his hands on the vehicle to facilitate a pat-down of his outer clothing for weapons. According to Ransom's suppression motion that cited police body-cam video, that was when Ransom spontaneously stated he had marijuana in his right pocket. (Record (R.) at 26). He was in possession of 5 grams of marijuana in a baggie. A vehicle search yielded other large bags with marijuana residue, as well as a bottle with 26 grams of codeine residue. He was arrested and handcuffed.

While handcuffed, Ransom tried to pull away from the officers and in the direction of traffic. Officers then forced him to the ground to prevent further

---

[1] While speaking with Ransom's mother's boyfriend at Ransom's residence, Officer Bower stated that he had known Ransom "for years and years." (V.R. 6/20/19; 8:40:40).

resistance. Ransom was then transported to police headquarters where his possessions were seized and inventoried, including keys in his possession and two cell phones.[2]

Officer Bower subsequently went to the address listed on Ransom's driver's license which was the home of his mother, Gilda Lewis.[3] Initially, Ransom's mother's boyfriend, Van Buren Smith, was the only person present at the house. Officer Bower told Mr. Smith that "Jarrus is back in trouble again . . . ." (V.R. 6/20/19; 8:40:05). He then engaged Mr. Smith in the following conversation:

> Officer: Let me tell you what the options are at this point.
>
> Smith: OK.
>
> Officer: I want to make sure [garbled] he doesn't have anything else illegal in the house – guns, drugs, anything like that.
>
> Smith: I wouldn't know.
>
> Officer: And that's fine. I wouldn't ask you to tell on him or anything like that. I know how it is.

---

[2] Later in this opinion we address the circuit court's erroneous finding of fact that the cell phones were found elsewhere; however, nothing in the record contradicted the substantial evidence that the phones were found in Ransom's possession at the time of his arrest.

[3] Ransom's mother's boyfriend, Van Buren Smith, said to Officer Bower, "I think he does stay here with his mom, but I don't see him that much. I'm not sure. . . . I didn't know if he was really stayin' here or not. I know when he first got out he had to use this address to stay here. And after that I don't know with him and his mom [garbled] . . . ." (V.R. 06/20/19; 8:41:13-8:41:34).

Smith:     Do you guys have a search warrant for this?

Officer:   That's where I'm headed, so just hold on. Let me finish explaining to you.

Smith:     [garbled] 'cause that's not my [garbled]

Officer:   I don't get that vibe from ya.

Smith:     Yeah, I don't – I just woke up and you're freakin' me out.

Officer:   I understand. Just let me explain to you.

Smith:     OK.

Officer:   I need to make sure he doesn't have anything else here.

Smith:     OK.

Officer:   He has some marijuana and it looks like he had bigger marijuana somewhere because he had a big garbage bag that used to have marijuana in it.

Smith:     I don't know.

Officer:   So, right now, what I'm – what we're doin' is we're knockin' on the door and we're asking for permission to look around, make sure he doesn't have anything here that's illegal.

Smith:     You see this isn't my house to say that.

Officer:   OK.

Smith:     What about his mom? Can I get his mom here and then you guys talk about all that or do I – I'm just tryin' to cooperate.

Officer: I understand.

Smith: 'Cause I don't want them to say, "Why'd you let them check the house?" I don't have no problem with y'all checkin' the house.

Officer: I understand. I don't want to put you in a bad place 'cause I understand the position you're in.

Smith: OK.

Officer: So, with that being said, why don't you go ahead and call his mom.

Smith: OK.

Officer: And she can even say, "Yes" or "No" over the phone.

(V.R. 06/20/19; 8:41:45-8:43:01). Mr. Smith called Ms. Lewis and put her on speaker phone.

After Smith and Lewis had a short conversation about how neither believed Ransom had any contraband in Lewis's home, Officer Bower was identified to Ms. Lewis and joined the conversation, as follows:

Officer: Would you have a problem with us taking a look around to make sure he doesn't have any more drugs or weapons here?

Lewis: I don't have any weapons, no drugs that I know of.

Officer: OK, so then is it alright if we look around and make sure?

Lewis: Yeah. Do y'all have a warrant?

Officer: No, ma'am. That's why we're asking your permission.

Lewis: Well, I guess if you have to. Let me speak to Van [Mr. Smith].

Smith: I'm right here on speaker phone. I talked to 'em about the warrant. I'm just tryin' to cooperate.

(V.R. 06/20/19; 8:43:42-8:44:11). After more conversation between Smith and Lewis that, in their opinion, Ransom was "not doin' all that here," Smith asked Lewis:

Smith: Do you want them to get a search warrant or is it OK to have 'em start looking?

Lewis: Do whatever you gotta do.

Smith: It's not my call. It's your house.

Lewis: I guess they can.

Smith: OK.

Lewis: But I don't know what they're gonna find.

Smith: Me either. I don't know either.

(V.R. 06/20/19; 8:44:28-8:44:44).

Soon, Ms. Lewis returned home. By then, Officer Bower had noticed what he described as a closet in an attached carport affixed to the house, but still within the curtilage of Ms. Lewis's property. The storage closet was locked. Officer Bower asked Ms. Lewis if she had a key. She indicated she normally kept

the key in a specific spot in her house and went to retrieve it. When she returned, she stated she was unable to find it and said Ransom must have it. As she described the key, Officer Bower realized he had seen it on Ransom's person during the arrest and property inventory process at the police station.[4] Officer Bower returned to the police station and retrieved the key.[5] He then returned to Ms. Lewis's residence and used the key to open the storage closet. Among the many household items in the closet, the investigating officers discovered additional marijuana and seized it.[6]

A search warrant was obtained to examine the contents of Ransom's two cell phones. That search yielded further evidence that Ransom was engaged in trafficking. Ransom was charged with one count of trafficking in marijuana, more than eight ounces but less than five pounds; third-degree possession of a controlled

---

[4] Specifically, Ms. Lewis said, "He [Ransom] might have the key. It normally stays right in here. . . . It has a little red thing on it . . . like a bottle opener type thing." Officer Bower immediately responded, "I'm pretty sure he's got that." (V.R. 06/20/19; 8:47:50-8:48:07). His testimony at the suppression hearing was that he remembered Ransom had it in his possession when he was arrested. In fact, a photograph of a red, bottle opener key ring holding four keys (none were car keys) had been inventoried as Ransom's property at booking and a photograph of the keys was part of the Commonwealth's compliance with the circuit court's pre-trial discovery order.

[5] Later in this opinion we address the circuit court's finding of fact that Officer Bower obtained the key from Ransom himself.

[6] Photos of the closet's contents, provided to defense counsel, showed a Black & Decker leaf blower, a disposable diaper box, outdoor furniture cushions, a Rain-X car cover box, Sterno and disposable chafing pans, and other household items, in addition to the bags of marijuana.

substance; possession of drug paraphernalia; resisting arrest; and failure to give a proper turn signal. Ransom moved to suppress all the evidence seized from his initial stop, asserting it was not based on probable cause. In addition, he moved to suppress all evidence from the subsequent search of his mother's home and storage closet, contending the investigating officers did not obtain lawful consent.

After an evidentiary hearing, the circuit court entered an order granting in part and denying in part the suppression motion. Specifically, the circuit court concluded the marijuana found on Ransom's person and in his vehicle was lawfully seized. The court also concluded the subsequent search of his Mother's home was lawful, because Officer Bower received her consent prior to the search. However, the court concluded that Ms. Lewis's consent did not extend to the search of her storage closet in her carport or the seizure of cell phones.

The circuit court determined the evidence seized from the storage closet was the result of an unlawful search because Ransom had a reasonable expectation of privacy in the storage closet, he controlled the key to access that closet, and the police deprived him of that key without his consent. Therefore, so goes the circuit court's rationale, the marijuana seized from the closet could not be introduced into evidence at trial. Furthermore, because the circuit court found as fact that the police recovered Ransom's two cell phones from the closet, none of

the evidence on those phones, obtained pursuant to a lawful search warrant, could be introduced into evidence at trial because it was "fruit of the poisonous tree."

The Commonwealth brought this appeal, claiming the circuit court made findings of fact not supported by substantial evidence and this led the court to erroneous conclusions of law. We agree.

## STANDARD OF REVIEW

Our review of a trial court's decision on a motion to suppress is two-fold. *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky. 1998). First, we must determine whether the trial court's findings of fact are supported by substantial evidence and, if so, they are conclusive. *Id.* Second, we review *de novo* the trial court's application of the law to those facts. *Brown v. Commonwealth,* 416 S.W.3d 302, 307 (Ky. 2013).

## ANALYSIS

To begin, key findings of fact undergirding the circuit court's ruling are not supported by substantial evidence. We first address the erroneous factfinding.

There is no evidence that the cell phones were ever in the closet. They were seized from Ransom's person at the time of his arrest. The police investigative report states that "Ransom was in possession of two phones when he

was stopped . . . ."[7] Ransom's own memorandum in support of his suppression motion states, "Cell phones were seized from Mr. Ransom." (R. at 26). During the suppression motion hearing, Ransom's counsel even objected to the Commonwealth's questions about the cell phones as being irrelevant. (V.R. 04/18/19; 8:56:23) ("Unless they've got a purpose to this [testimony about the phones] as to the suppression motion, I object.").

The text-message evidence found on those cell phones is not the fruit of a poisonous tree. Rather, the evidence resulted from a search based on a warrant, following a lawful seizure of property pursuant to a lawful arrest. (V.R. 04/18/19; 8:55:56). Such evidence should not have been suppressed.

That leaves only the question of evidence discovered in the closet.

The evidence was conflicting regarding where Officer Bower obtained the key to Lewis's closet. The property and evidence voucher listed property seized when and where Ransom was arrested, which indicates the key was in police possession when Officer Bower retrieved it,[8] notwithstanding that the officer testified he returned to police headquarters and "got the key from him there." (V.R. 06/20/19; 8:55:50). There are two reasons this is a distinction

---

[7] The document is Bates stamped as 000001 and is preserved in the record as a digital file on a CD attached to the Commonwealth's response to court's order of discovery. (R. at 8).

[8] The voucher inventoried the property Officer Bower seized when and where he arrested Ransom. The document is Bates stamped as 000013 and is preserved in the record as a digital file on a CD attached to the Commonwealth's response to court's order of discovery. (R. at 8).

without legal consequence: (1) The key was not unlawfully taken from Ransom, whose consent was not required under these circumstances; and (2) it was sufficient that Lewis gave the police consent to search her closet on her carport that contained her property.

The Supreme Court of the United States has addressed an analogous Fourth Amendment question upon which this Court can readily rely to resolve the legal question here. In *United States v. Edwards*, a lawfully arrested defendant spent the night in custody before the police realized examination of the clothes he was wearing when he committed his crime might yield evidence. 415 U.S. 800, 801-02, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). Officers purchased substitute clothing for the defendant and seized from him the clothing he had been wearing the day before. *Id*. at 802.

The specific question *Edwards* answers is: "whether the Fourth Amendment should be extended to exclude from evidence certain clothing taken from respondent Edwards while he was in custody at the city jail approximately 10 hours after his arrest." *Id*. at 801. As applicable in the case now before this Court, *Edwards* says:

> the normal processes incident to arrest and custody had not been completed when Edwards was placed in his cell on the night of May 31. With or without probable cause, the authorities were entitled at that point not only to search Edwards' clothing but also to take it from him and keep it in official custody. . . .

-11-

. . . .

> This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that Edwards was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention. The police did no more [the day after the arrest] than they were entitled to do incident to the usual custodial arrest and incarceration.

*Id.* at 804-06.

But the Supreme Court did not stop there. Discussing *United States v. Caruso*, 358 F.2d 184 (2d Cir. 1966), it noted:

> Caruso is typical of most cases in the courts of appeals that have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration.

*Id.* at 807-08 (footnotes omitted).

In upholding the seizure of Edwards' clothes, the Supreme Court stated that although "'the legal arrest of a person should not destroy the privacy of

-12-

his premises, it does – for at least a reasonable time and to a reasonable extent – take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.'" *Id.* at 808-09 (quoting *United States v. DeLeo*, 422 F.2d 487, 493 (1st Cir. 1970)).

The normal process incident to arrest and custody had not been completed when Ransom was delivered to the police station. Any subsequent search and seizure that may have occurred while he was in police custody remained a search incident to a lawful arrest, rendering it valid. Any privacy interest Ransom had in the key while in custody was out of the realm of Fourth Amendment protection, as it was potential evidence of criminal activity.

One exception to the Fourth Amendment's requirement of a warrant is when a search is pursuant to a proper consent. *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky. 1992) (citing *United States v. Watson*, 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976)). The circuit court concluded that Ransom's mother consented to the search of her home but could not consent to the search of the closet. We disagree.

Consent to a search of premises need not be given by the suspect of criminal activity but may also be given by a third party who possesses common authority over the premises. *Commonwealth v. Nourse*, 177 S.W.3d 691, 696 (Ky. 2005). The test for third-party consent rests on whether the third party has

common authority or a sufficient relationship to the area or effects to be searched. *Colbert v. Commonwealth*, 43 S.W.3d 777, 781 (Ky. 2001). "In analyzing the validity of a third-party consent, we must determine whether a police officer could reasonably believe from the context involved that the consenting party had common authority over the premises." *Perkins v. Commonwealth*, 237 S.W.3d 215, 219 (Ky. App. 2007). We conclude Ransom's mother had common authority over the storage closet, rendering the search valid.

As noted above, the storage closet was affixed to the outside of Lewis's house. When asked expressly if she would open the exterior closet, she unhesitatingly went to retrieve the key and was surprised to find it missing. She said the key was not where she normally kept it. In itself, that is evidence of communal use of the key and closet by all who resided in Lewis's house. She said and did nothing suggesting Ransom used the closet exclusively or otherwise exercised sole dominion over the closet or its contents. She could have consented to have the locked door forced open, but her description prompted Officer Bower's recollection of having seen the key when he arrested Ransom, and that meant forcing the door open was unnecessary. We conclude it was reasonable for the investigating officers to believe Lewis had authority over the storage closet. That conclusion is not undermined by evidence that the contents of the closet were not

limited solely to bags of marijuana but included the very kinds of household items a homeowner like Lewis would store there.

Ransom's control over the key may be evidence of his dominion over the marijuana, but it does not equate to his exclusive expectation of privacy in the closet or its other contents. Accordingly, we conclude the search of the closet did not violate Ransom's Fourth Amendment rights.

It is true that, with Ransom in custody, there was time to obtain a search warrant. However, Lewis's consent made that step constitutionally unnecessary, eliminating both delay and any risk of evidence tampering in the meantime.

## CONCLUSION

That part of the Jefferson Circuit Court's September 19, 2019 order granting, in part, Ransom's motion to suppress evidence is hereby reversed.

ALL CONCUR.

BRIEF FOR APPELLANT:

Daniel Cameron
Attorney General of Kentucky

Jason B. Moore
Special Assistant Attorney General
Louisville, Kentucky

BRIEF FOR APPELLEE:

Rob Eggert
Tricia Lister
Louisville, Kentucky