ZAGER, Justice
(dissenting).
I respectfully dissent.
After “thoroughly reviewing all of the evidence, the district court concluded that under the Fourth Amendment, Olson had apparent' authority to consent' to the search of the backpack located in his bedroom. I agree, and I would affirm the decision of the court of appeals and the judgment of the district court.'
As a preliminary matter,_ I agree with the conclusion reached by the majority that- this case cans be decided, under the Fourth Amendment to the United States Constitution and the cases cited therein, See Illinois v. Rodriguez, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148, 160 (1990). However, L also think it is important, to recognize the standard of re? view that must be utilized. Our review in this case is de novo. State v. Gaskins, 866 N.W.2d 1, 5 (Iowa 2015). “Because this case concerns-the constitutional right to be free from unreasonable searches and. seizures, our review -of the district court’s suppression ruling is de novo.”. Id. (quoting State v. Watts, 801 N.W.2d 845, 850 (Iowa 2011)). “We independently evaluate the totality of the circumstances found in the' record, including the evidence introduced at both the suppression hearing and at trial.” Id. (quoting State v. Vance, 790 N.W.2d 775, 780 (Iowa 2010)).
I. General Search and Seizure Principles.
The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall 'not be violated, and no Warrants shall issue, but -upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. ■
*446 U.S. Const, amend. IV. Both the Fourth Amendment and article I, section 8 of the Iowa Constitution protect the right of individuals to be free from unreasonable searches and seizures. Id.; Iowa Const, art. I, § 8.
“Warrantless searches are per se unreasonable if they do not fall within one of the well-recognized exceptions to the warrant requirement.” State v. Tyler, 867 N.W.2d 136, 169 (Iowa 2015) (quoting State v. Lowe, 812 N.W.2d 554, 568 (Iowa 2012)). Under the Fourth Amendment, a warrant is not required to authorize a search performed pursuant to voluntary consent. See State v. Pals, 805 N.W.2d 767, 777 (Iowa 2011). Likewise, we have recognized that an officer may rely on the consent of a third party to authorize a warrantless search, so long as the circumstances indicate the third party had actual authority to consent to a search of the location. See, e.g., State v. Campbell, 326 N.W.2d 350, 352 (Iowa 1982). The State has conceded that there was no actual authority for the third party — Olson—to consent to the search of the backpack.
II. Apparent Authority to Consent to a Search.
Under the Fourth Amendment, a law enforcement officer is entitled to rely on the consent of a third party authorizing a warrantless search based on that third party’s apparent authority to consent to the search in question. Rodriguez, 497 U.S. at 186, 110 S.Ct. at 2800, 111 L.Edüd at 160. The Supreme Court has made it clear that under the Fourth Amendment, law enforcement officers may conduct a search based on the consent of a party who does not have actual authority over the property to be searched, so long as the officers reasonably (though erroneously) believe that the person who has consented to their entry had authority over the premises. Id. In Rodriguez, the Court concluded a warrantless search conducted after obtaining the consent of a third party does not violate the Fourth Amendment so long as the facts available to the officers at the time the search occurred would “ “warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.” Id. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161 (quoting Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968)). If not, “warrantless entry without further inquiry is unlawful unless authority actually exists.” Id. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. The Court cautioned that “surrounding circumstances could conceivably be such that a reasonable person would doubt [an individual’s assertion of authority] and not act upon it without further inquiry.” Id. at 188, 110 S.Ct. at 2801, 111 L.Edüd at 161. As such, we utilize an objective standard to determine whether apparent authority existed at the time of a warrantless search. Id.
We have adopted these doctrines through our own case law. See, e.g., Lowe, 812 N.Wüd at 576. Relying on Rodriguez, we confirmed that the authority to consent includes not only actual authority, but also apparent authority. Id. We also confirmed that apparent authority validates a search when officers “enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry” had the authority to do so. Id. (quoting Rodriguez, 497 U.S. at 186, 110 S.Ct. at 2800, 111 L.Edüd at 160). We apply an objective standard when analyzing consent and ask, “[Wjould the facts available to the officer at the moment ... warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?” Id. (second alteration in original) (quoting Rodriguez, 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161).
*447 A. Apparent Authority Applied to Closed Containers. As the majority properly notes, the Supreme Court has yet to apply the doctrine of consent by a third party to the search of another’s closed container under the theory of apparent authority. I also recognize that there is a split of authority as to the application of the doctrine among the federal circuit courts of appeals. However, what is clear is that any analysis of the doctrine is highly fact-specific. It is equally clear that it is only in those circumstances where ambiguity exists that it is reasonable to require that officers make further inquiry regarding the ownership of the closed container. ' “Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.” Rodriguez, 497 U.S. at 188, 110 S.Ct at 2801, 111 L.Ed.2d at 161. While acknowledging a split of authority, a review of various decisions of the United States Courts of Appeal confirms several conclusions. First, the facts in those cases are distinguishable from the facts presented here. Second, there is no ambiguity relating to the authority of Olson to consent to the search of the backpack in this case. Therefore, the law enforcement officers had no duty to make further inquiry before they searched the backpack.
1. Tenth Circuit Court of Appeals. In United States v. Salinas-Cano, the defendant was arrested following a controlled drug buy. 959 F.2d 861, 862 (10th Cir. 1992). After his arrest, police went to his girlfriend’s apartment and asked her for permission to search. Id. The police told her.they were specifically interested in Salinas-Cano’s possessions. Id. She consented to the search and told the police where Salinas-Cano kept his belongings at her' apartment. Id. The police opened what they had just been advised was Salinas-Cano’s closed but unlocked suitcase, where they discovered cocaine. Id.
In addition to the obvious differences between the facts of Salinas-Cano and the case presently before us, the legal arguments were also distinct. In Salinas-Cano, the government primarily relied on the concepts of actual authority, joint access, and control in arguing for the admissibility of the' evidence. See id. at 863. The government also attempted to utilize the apparent authority doctrine because the officer testified he thought the consenting party — the girlfriend — had joint access and control. Id. at 865. As properly concluded by the court, apparent authority “does not empower the police to legitimize a search merely by thé incantation of the phrase.” Id. The analysis should instead rest entirely upon the reasonableness of the officer’s belief in the apparent authority. Id.
There is no logical correlation between the facts in Salinas-Cano and the facts in the case now before us. I would agree there may arguably be ambiguity under the facts presented in Salinas-Cano regarding actual authority, joint access, and control. Under those circumstances, further inquiry by police would appear reasonable. The failure to make this further inquiry' regarding actual authority, joint access, and control over what the officers knew was someone else’s property was unreasonable. However, the decision in t that case bears no factual similarity to the facts of our case and does not help inform the outcome here.
2. Sixth Circuit Court of Appeals. The case currently-before us is also clearly distinguishable from the facts considered by the Sixth Circuit in United States v. Waller, 426 F.3d 838 (6th Cir.2005). After a falling out with the owners of his previ *448 ous residence, Waller obtained permission from a friend to store his personal belongings in the friend’s apartment. Id. at 842. Waller kept a brown luggage bag, garbage bags of clothing, and food at the friend’s apartment. Id. He also ate, showered, and changed clothes at the apartment, but he did not sleep there. Id. Waller was later arrested in the parking lot of the apartment complex where the Mend resided. Id. After' arresting Waller in the parking lot, the arresting officers proceeded to the apartment. Id. Waller’s friend, the tenant, advised the officers that Waller had been Storing some property in,his apartment. Id. The friend consented to the search of the apartment, and the police began searching for personal items belonging to Waller. Id. ■ One of the officers found the zipped brown luggage bag in the bedroom closet, opened it, and discovered two handguns. Id.
Relying on Rodriguez, the court stated, “[W]here the circumstances presented would cause a person of reasonable caution to question whether the third party' has mutual usé of the property, ‘warrantless entry without further inquiry is unlawful[.]’ ” Id. at 846 (alteration in original) (quoting Rodriguez, 497 U.S. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161). The court concluded that “the circumstances made it unclear whether Waller’s luggage bag was ‘subject to mutual use by[5] [his friend] and therefore the officers’ war-rantless entry into that luggage without further inquiry was unlawful.” Id. at 847: As will be discussed below, ambiguous facts related to mutual use and apparent authority are not present in our case.
3. Seventh Circuit Court of Appeals. The facts considered by the Seventh Circuit in United States v. Melgar are most analogous to the facts before us now. 227 F.3d 1038 (7th Cir.2000). In their investigation of the charges of passing counterfeit cheeks, officers obtained consent to search a motel room from the woman who had rented it. Id. at 1039. There were a number of other people in the room when the officers arrived. Id. While conducting a séareh of the room, the officers found a purse with no identifying marks on it under the mattress of the hotel bed. Id. at 1040. Without inquiring further as to which of the occupants owned the purse, the officers opened it. Id. The court rejected the argument that the officers should have inquired further as to the actual ownership of the purse. Id. at 1041-42. The court concluded that apparent authority exists so long as the officer, who conducts a warrantless search pursuant to third-party consent has no reliable informátion indicating that the consenting party has no authority over the container being searched. Id.
The majority rejects the Seventh Circuit’s approach for requiring such “reliable information.” However, I believe that requiring some reliable facts is the most logical approach.- The facts are even stronger in our case. Olson, the sole tenant of the room, provided consent to search his bedroom. After being granted consent, to search, police had no reason to believe there was any limitation on the consent unless some information, whether expressed by someone, or clear from the circumstances, alerted the officers that the authority to search a closed container in his .bedroom may be in question. A simple “that purse isn’t mine” on the facts of Melgar, or a simple “that’s not my backpack” here, would seem to suffice. Simply standing mute does not.
4. Second Circuit Court of Appeals. The facts of the Second Circuit’s decision in United States v. Snype -are so convoluted that even a full recitation would not, in my opinion, contribute to a principled resolution of our case. See 441 F.3d 119, 125- *449 27’ (2d Cir.2006). However, the one principle that does evolve from this opinion is the approach to apparent authority taken by the Second Circuit;’ The approach taken in Snype is that an open-ended consent to search an apartment-by a lessee permits the search and seizure of any items found in the apartment, with the • exception of those that “obviously belonged” to another person. Id. at 137. This is a fact question to be decided objectively based on a review of the unique facts and circumstances of each case.
III. Applicable Test.
The majority spends a considerable number of pages attempting to decide who has the burden of proof in a case of apparent authority to search when consent is given by a third party. There is really no question that the' government bears the burden of proving that any search does not violate the Fourth- Amendment. Under Rodriguez, when consent to a warrantless search is given by a third person, such consent must be based on actual or apparent authority. See Rodriguez, 497 U.S. at 188-89, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. None of the authorities cited by the majority stand for the proposition that the defendant must come forward with evidence to show the officer could not have reasonably relied on the third-party consent. There is no burden placed on the defendant. Rather, an objective review of the facts of each case will speak for themselves. Likewise, the various competing interests discussed by the majority are already subsumed in the standards that the courts have been utilizing for decades.
In Rodriguez, the Court-clearly established that the government has two potential avenues for meeting its burden of proving the effectiveness of third-party consent. ■ First, the government may introduce evidence demonstrating that the person who consented to the search had actual authority to consent. Id. at 181, 110 S.Ct. at 2798, 111 L.Ed.2d at 155-56. Second, the government may introduce evidence demonstrating, that the facts available to the officer at the time of the search would have warranted a person of reasonable caution in the belief that the person whose consent had been obtained had the authority to consent to the search. ’ Id. at 185-86, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. Nothing in these standards shifts the burden of proof to the defendant. «.
This brings us to the issue of ambiguity. The majority takes the position that any time there is a question of ownership of a container, no matter how remóte or how attenuated it may be, an ambiguity exists which requires further inquiry by police. Failing to make this further inquiry makes the search unlawful. However, this is not what the law or the Constitution requires.
Rodriguez neither imposes a duty of exhaustive inquiry by police before apparent authority will, be found to exist, nor credits willful ignorance; it requires that the officer’s belief in the consenter’s authority over the place or object be objectively reasonable:
State v. Westlake, 158 Idaho 817, 353 P.3d 438, 442 (Idaho Ct.App.2015). Police may not accept an invitation to search if the existing circumstances would cause a reasonable person to doubt the consenter’s authority, absent any further inquiry. Id. The question here is whether a reasonable police officer, looking at all the facts available, would doubt that Olson had the authority to consent to the search" of his bedroom and the contents of his bedroom, including the backpack. The answer is that there is no reasonable doubt. There is also no ambiguity requiring further inquiry. There was no Fourth Amendment violation here. ■
*450 IY. Analysis.
The parties stipulated Olson did not have actual authority to consent to the search of Jackson’s backpack. In addition, the State conceded Jackson maintained control over his backpack located in Olson’s bedroom. We must therefore determine whether Olson had the apparent authority to consent to the search of Jackson’s backpack. Any analysis must begin with a full recitation of the facts.
A. Facts. On November 13, 2012, Iowa City police officer Michael McKenna was dispatched to the On the Go BP gas station in Iowa City after a report of an armed robbery. The store clerk reported that a black male with a thin build, wearing a black mask and a red coat, entered the store, pointed a gun at him, and demanded the money in the cash register and a carton of Newport 100’s cigarettes. Detective Scott Stevens of the Iowa City Police Department was the primary investigator for the On the Go BP robbery. Detective Stevens'watched the surveillance video of the robbery with the store owner. The video showed a medium height, black male enter the store wearing a red coat, a black face mask, and white tennis shoes. On December 13, the store owner called Detective Stevens and told him that a customer had identified the robber as a man with the street name “Juicy.” With this information, Detective Stevens was able to identify “Juicy” as Marvis Latrell Jackson. After unsuccessful attempts to reach Jackson, Detective Stevens obtained a warrant for his arrest.
At 12:35 a.m. on December 31, Iowa City police officer Michael Smithey was dispatched to Gumby’s Pizza after a report of an armed robbery. The Gumby’s employee told Officer Smithey that two black males had entered the restaurant wearing black hats and had black bandanas covering their faces. One of the men had pointed a handgun at him and demanded money from the cash register. The employee complied and estimated that the robbers took $125 in one dollar bills, $50 in five dollar bills, and one twenty dollar bill. The men ran out of the store and headed northbound on Gilbert Street.
While Officer Smithey met with the employee, another man approached the officer and asked if there had been a robbery. The man stated he had just witnessed two black males walking away from the area and one of the men appeared to be holding a fistful of cash. He also stated that when the men saw him, they took off running. Officer Smithey drove the witness to the location where he had last seen the men on foot. Officer Smithey noticed footprints in the fresh snow and called for a canine unit. Officer Brandon Faulkcon and his canine partner arrived and were able to track the scent and the footprints to the southeast corner of a building located on South Gilbert Street. Also present were Officer Smithey and Officer Alex Strieker. The street level of the building was a retail establishment, while the second story contained apartments with outside doors accessible by a common stairwell in the rear of the building. The officers visually surveyed the exterior of the building. They saw lights on in one of the apartments and observed a tall black male looking out of the window inquisitively. The man appealed to match the description of one of the robbery suspects. When he saw the officers looking up at him, he quickly ducked out of sight.
After this observation, the officers decided to approach the apartment. When the officers arrived at the front door, they noticed that the lights in the apartment had been turned off. While they were standing outside the front door, they heard the apartment door lock from the inside. Officer Smithey knocked on the door and *451 announced he was a police officer. A tall black male answered the door and identified himself as Wesley Turner. The officers explained why they were there, and Turner allowed them inside the apartment. When officers asked who else was present in the apartment, Turner answered that it was only him, his girlfriend Alyssa Miller, and their roommate Gunnar Olson. Turner told officers that Olson was asleep in his room, but he agreed to wake him so officers could speak with him. After Turner knocked on the bedroom door, Olson, who is also a black male, emerged' from his room.
The officers decided to speak with the men separately. Officer Strieker continued to speak with Turner in the living room while Officer-. Smithey spoke with Olson in the kitchen. Turner said he had been in the apartment since he returned home from, work at 9:00 p.m. He reported he had not seen anything suspicious. When asked who lived in the apartment, Turner confirmed that he lived in the apartment with only Olson and Miller.
In the kitchen, Olson also confirmed, that the only residents of the apartment were himself, Turner, and Miller. Officer Smi-they asked Olson if he could look in his room. Olson told him that he had been sleeping in his room after work and, awoke to find his cousin, Marvis, sleeping next .to him. Upon further questioning by Officer Smithey, Olson admitted that he did not know Marvis’s last name and that they were not really cousins. When Officer Smithey entered Olson’s, bedroom, he observed a black male — who he later identified as Jackson — lying on an air mattress, shirtless but wearing pajama bottoms. Officer Smithey observed that Jackson’s .neck and brow were sweaty, which he thought was odd since the. apartment was not warm and no one else was sweating. Olson then attempted to wake Jackson. Officer Smithey thought it seemed considerably more difficult than it should have been to wake him. After Jackson got up, he was asked for identification. Jackson stated that he-.did not have any identification, but identified himself as Marvis Lat-rell Jackson. The officers ran Jackson’s name through dispatch and were advised of the outstanding warrant for his arrest. Officer Smithey arrested Jackson and turned him over to another officer, who removed Jackson from the apartment. Jackson did not indicate he had any personal possessions in the apartment or ask to retrieve any personal property.
After Jackson was taken from the apartment, Officer Strieker continued to speak with Olson. Olson repeated that Jackson had apparently arrived sometime earlier that evening after he had gone to sleep. He again confirmed that no one else lived in the apartment except for the three tenants. When Olson was asked whether there were any guns in the room, he replied that there should- not be or that he did not know of any. Olson repeated that he lived in the bedroom alone. Officer Strieker asked Olson if he would consent to the search of his bedroom for guns or any evidence of the robbery. . Olson consented. When Officer Smithey arrived, Officer Strieker informed him that, Olson had consented to the search of his bedroom for guns and any evidence of the robbery. Officer Smithey confirmed with Olson that he consented to the search of his bedroom.
Officer Smithey performed the search. He.began the search of the bedroom by searching under and around the air mattress and on a chair. He then grabbed a backpack that was sitting on the floor in the doorway of the bedroom closet. The backpack was closed and had no obvious identifying marks or tags. Officer Smi-they opened the closed backpack and took *452 out a wallet and placed it, unopened, on a nearby chair. Officer Smithey reached in a second time and retrieved a pair of dark jeans that were wet around the cuffs. Upon-removing the jeans, Officer Smithey saw'a black handgun in the backpack. After discovering the handgun, Officer Smi-they discontinued his search.
Officer Smithey then checked the wallet for identification and found that it contained identification belonging to Jackson. Officer Smithey took a photograph of the handgun located inside the backpack to use in an application for a search warrant. He instructed the other officers to lock down the apartment so a search warrant could be obtained. After the officers locked down the apartment, they conducted a protective sweep. During the sweep, the officers observed a marijuana grinder and pipe, which they' photographed and included in the search warrant application. Officer Smithey also included the photograph of the handgun in the application. Investigator Tom Hartshorn of the Iowa City Police Department applied for and obtained the search warrant for the apartment. Investigator Hartshorn executed the warrant and found clothes matching the description of the Gumby’s robbers, in addition to money in an amount matching the description of the money taken from Gumby’s.
B. Application. The threshold question in this case is whether, based on all of the facts presented, Officer Smithey reasonably relied on the apparent authority of Olson to consent to the search of the backpack located within his bedroom, or whether Officer Smithey reasonably needed to make further inquiry as to the ownership of the backpack. Based on the fact-intensive, objective standard that we must utilize, a reasonable person in Officer Smi-they’s position would have concluded that Olson had the apparent authority to consent to the search of the backpack located on the floor of his bedroom. We only need to’review the facts presented here to support this conclusion.
As á starting point, contrary to the position of the majority, there is nothing ambiguous about Olson’s authority to consent to the search of his room, including the backpack. The officers initiated contact with the' occupants of the apartment as part of their investigation of an armed robbery that had just occurred. Their investigation revealed a direct path leading from the site of the robbery to the door of the apartment. This all occurred between 12:35 a.m.- and 1:00 a.m. There is no dispute that officers knocked on the door, identified themselves, and explained that they were investigating a robbery that had just occurred. Turner consented to then-entry into the apartment. They encountered Turner’s girlfriend, Miller, who also acknowledged that she lived in the apartment. Both Turner and Miller told officers that the only other person in the apartment was their roommate, Olson.
Turner went to Olson’s bedroom and woke him. The officers decided to speak with the two men separately. Officer Strieker spoke with Turner. Turner indicated that he had been in the apartment since he arrived home from work at approximately 9:00 p.m. He had observed nothing suspicious. Meanwhile, Officer Smithey spoke with Olson in the kitchen. Olson confirmed he lived alone in the apartment with Turner and Miller. Olson told the officer the bedroom was his alone. Both Turner and Olson independently confirmed that there were-no other tenants of the apartment, and there was no one else present in’ the apartment. Despite repeated-affirmations from all three tenants to the contrary, when Officer Smithey asked Olson if he could peek inside his bedroom, he learned there was another *453 person in the .apartment. ■ Olson claimed that he had gone to sleep, alone, earlier in the evening. It was only , after he had been awakehed by Turner that:he realized his cousin Marvis had slipped- into bed with him and was sleeping. When asked, Olson acknowledged that he did- not know Mar-vis’s last name and they were not really cousins.
Olson led Officer Smithey to his bedroom while Officer Strieker looked oni It is at this point that an objective review of the facts becomes critical. The majority blindly accepts the statements made by Turner, Olson, and-Miller, even in the face of their obvious incredibility and dishonest ty. No one suggested that Jackson had broken into the apartment,- and no one suggested that the tenants were alarmed that Jackson was found m the apartment. However, these are not facts or evidence of anything. Likewise, none of .the inhabitants — Turney, Miller, or Olson — even remotely suggested to the officers that Jackson was a tenant[5] or an overnight guest.[6]
The majority is. persuaded by the-statements from Turner that he had been home since 9:00 p.m., that no one had recently arrived at the apartment, and-that he had not observed anything suspicious. Of course, all of these statements defy credibility. Further, the majority fails to explain the obvious feigned sleep or the sweat observed, on Jackson’s forehead. This apparently does not require an explanation since “they found him to be cooperative once he was awake.”
It was at. this time that Jackson was informed of the outstanding warrant for his arrest. While neither officer could specifically ■ remember telling Jackson to put his shirt back on before exiting the apartment, they' both believe-Jackson got dressed since it was the middle of winter. The officers did not ask Jackson if he was staying in the apartment or if he had any of his belongings in the apartment. Nor do I believe they Were required to do so. The officers were following up on an- armed robbery that had just occurred. The robbers had fled from the scene of the 'robbery, to the apartment. In an attempt to elude detection, Jackson threw off his clothes, jumped into Olson’s bed, feigned sleep, and hoped that the-tenants could prevent officers from detecting him. Officers were repeatedly told by all three tenants-.that- there vyas no. one .else in. the apartment and that, no one. else lived there. There, is nothing ambiguous about this scenario. There is , nothing in this. record which would alert , a reasonable officer to stop and ask Jackson whether he was. staying there or whether he had any personal property located. in .the .apartment. Of course, if Jackson wanted to alert officers that some of his property was located in Olson’s bedroom, he could easily have spoken up. ' . , .
’ Officers then 'asked Olson for consent to search his bedroom, which was granted. More importantly, Olson was specifically asked for consent to search his bedroom to look for' guns and ’any evidence’ of the robbery. When asked if-any guns would be found, he replied there should not be any guns, or at least no guns that he knew of.' Olson consented to the search, without *454 limitation. Olson also failed to inform the officers that some of the property in his bedroom might not belong to him. Neither officer asked Olson whether he owned the backpack, or confirmed with Olson that everything in his bedroom belonged to him. Again, nothing in the record would require such an inquiry. There is no ambiguity under the facts here. Nothing would have alerted Officer Smithey,- as a person of reasonable caution, to question whether a backpack located near or partially in Olson’s bedroom closet actually belonged to him.
Certainly there were no facts tending to show the backpack belonged to Jackson. There is simply no evidence to support this. The majority first asserts that the circumstances clearly suggested that Jackson was an overnight guest. But let’s look at the facts. The majority finds significant that it was the middle of the night. However, the armed robbery the officers were investigating had occurred only minutes before. Jackson appeared to be asleep— yet the feigned heaviness of the sleep and the obvious sweat observed on Jackson’s forehead belies that he was asleep. Olson told the officers that he did not know when Jackson disrobed and got into bed with him, but he was not alarmed. After first lying about Jackson’s mere existence in his bedroom, Olson could not even tell the officers Jackson’s last name. Under this set of facts, the majority concludes that “obviously Olson and Jackson are familiar enough that Jackson’s presence in Olson’s room late at night was not an unusual occurrence.” I find this incredible.
The majority then enters into the realm of fantasy by suggesting that Jackson may have even had a key to the apartment because Turner and Miller did not appear to know Jackson was in the apartment and Olson claimed Jackson arrived after he was asleep. Or perhaps Jackson and someone else committed an armed robbery, Jackson ran to Turner’s apartment where they were let in, Jackson ran into Olson’s bedroom, disrobed and pretended to go to sleep, and hoped that Turner and Miller could hold the authorities at bay. It is inconceivable that the officers here would reasonably believe that Jackson simply arrived in Olson’s bedroom when no one else was home sometime after Olson went to sleep but before Turner arrived home from work.
Second, I agree that officers would have reasonably known that Jackson was probably wearing clothing other than his pajama pants prior to his entering Olson’s bedroom; However, I do not believe that adds any cogent facts to our analysis. His clothing could have been literally anywhere in the apartment. The officers had no reason to assume an overnight guest would stuff their wet pants in a backpack. It is much more likely the guest would toss their wet pants over a chair, in the closet, or on the tub in the bathroom. The officers here were not looking for wet pants in a backpack, nor would they have any other reason to assume that the backpack belonged to Jackson. None of the facts in this record would lead a reasonable officer to question the ownership of the backpack.
Similarly, the majority claims that the officers should have somehow reasonably known that Jackson’s clothes were concealed in an unmarked backpack located in Olson’s bedroom because he was in his pajama pants. To support this inference, the majority repeats the already discredited story from Turner and Miller that they had no idea that Jackson was in the apartment. If they had seen his clothes in the bathroom, kitchen, or living room, then they would have known Jackson was there. The majority believes this “suggests” Jackson either changed into pajama pants in Olson’s room or moved the clothing to *455 Olson’s room after changing. Then Jackson had the courtesy to stuff only his pants into the backpack, because this is the sort of container a person staying overnight in a place other than his own home might, use to hold clothing and other personal items. But where is all of Jackson’s other clothing? Where did he find the clothing that he presumably wore out of the apartment? Other than speculation and conjecture, there is simply nothing in these facts that aid Jackson. .
Last, the qualified statements made by Olson clearly do not alert officers that he knew there were items in his bedroom that did not belong to him, namely the backpack. Olson did not give the officers a definitive, answer ■ when asked whether there was a gun in his room. This should not come as a shock based on the lack of honesty by all of the residents of the apartment up until this time. The majority takes this uncertainty in response and again suggests. Olson knew there were items in the room that did not belong to him and knew that one of those items might be a container concealing a gun. I do not believe that Olson’s avoidant answer to the question about a gun suggests anything close to this to a reasonable officer, nor would it suggest anything to a reasonable person.
C. Conclusion. Based on all of the above unique facts' and circumstances, the majority concludes a reasonable officer would have questioned the ownership of the backpack and questioned whether Olson had the apparent authority to consent to the search of it. However, this conclusion rests upon the improper application of the Constitution and case law. Our inquiry under the Federal Constitution is whether it was reasonable for Officers Smithey and Strieker to believe that Olson had authority to consent to the search of the bedroom and the backpack contained therein. See Rodriguez, 497 U.S. at 186, 110 S.Ct. at 2800, 111 L.Ed.2d at 160 (“Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement' officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably.”). In determining whether it was reasonable for the officers to conclude Olson had authority to consent, we apply an objective standard. See Lowe, 812 N.W,2d at 576. We ask if “the facts available to the officer at the moment ... [would] ‘warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.’” Rodriguez, 497 U.S. at 188, 110 S.Ct. at - 2801, 111 L.Ed.2d at 161 (quoting Terry, 392 U.S. at 21-22, 88 S.Ct. at. 1880, 20 L.Ed.2d at 906). All of the facts presented here would warrant a man of reasonable caution to believe that Olson had the authority to consent to the search of his room and the contents therein, including the backpack.
The majority creates ambiguity in the undisputed facts by suggesting scenarios I have discounted. above. Nothing in the facts suggests Jackson was either an overnight guest or staying at the apartment. There is no reasonable ambiguity here. Importantly, when officers searched the backpack, they did not know who was involved in the • restaurant robbery. - The point of the consent search was an attempt to find evidence of the robbery. Jackson had been arrested for an unrelated robbery. that occurred weeks before. Jackson had not been arrested for- the restaurant robbery that had just occurred.
The majority then leaps to the conclusion that the very purpose Of the search of the backpack was to. find evidence linking Jackson to the restaurant robbery — rather than Olson, whose bedroom was being searched. There is nothing in the record *456 to support this' statement. And there is nothing in the record to suggest the' backpack even belonged to Jackson. Then the majority imputes to Officer Smithey that “he would have no motivation to open the closed backpack unless he believed, it might belong to Jackson.” Nothing in the record even remotely suggests this. In fact, the only evidence in the record is that officers did not know who might be involved in the restaurant robbery.
Officers were investigating a ■ robbery and were interested in trying to find the gun that was used and any other evidence of the robbery. Olson repeatedly and un-qualifiedly consented to the search of his bedroom. Nothing in the record suggests an alternative, improper motive by officers in their search of the backpack in Olson’s bedroom — certainly nothing targeting Jackson or his personal property. ■
Finally, the majority concludes that Officer Smithey could riot reasonably rély on the apparent authority doctrine to search the backpack because it was not reasonable to believe that Olson owned it. But what evidence suggests Officer Smithey would' not -reasonably believe Olson owned the backpack? Officers-were repeatedly told by all the occupants that only - the three tenants lived there. Olson confirmed that he lived in his bedroom by himself. Olson originally denied that there was anyone else in his bedroom. When caught, he did not even know Jackson’s last name. - • ’
After Olson roused him, Jackson told the officers his name, but he also told them he had no identification. Jackson did not tell officers his identification was in 'His wallet in his backpack located a few feet away. After being arrested on the outstanding warrant, Jackson did not alert officers that he had a backpack located nearby. The backpack was located on the floor near or in Olson’s bedroom closet. During the search, Officer Smithey opened the backpack, discovered a wallet, and set it aside. According to the majority, this should somehow have alerted Officer Smi-they- that the backpack may belong- to someone other than Olson. How does this raise that inference? We have no idea where- Olson may have kept his billfold. This is not as unusual as the majority suggests, and it does not point to the backpack belonging to someone other than Olson. Many people carry their wallet in a separate bag or backpack. Further, officers had just been explicitly told by Jackson that he had no identification.
' Officer Smithey reached into the backpack and discovered the jeans with the wet hem." Again, officers did not know who the jeans belonged to, but it was easy to conclude the-jeans may have been related to the robbery. The majority then concludes a reasonable officer should have suspected the backpack belonged to Jackson. I disagree. This is only evidence that- someone recently came in-from the outdoors — -which was exactly what the officers were investigating. At this point, it was more likely for a reasonable officer to believe that the pants belonged to Olson than to someone else. The. majority then faults the officers for removing the jeans from the backpack, which lead to the discovery of‘the gun. After this, discovery, and only then, was it reasonable to determine the ownership of. the backpack. It was not, as stated by the majority, to clear up any ambiguity that officers reasonably had as to the ownership of the backpack. Nothing in the record would have led a reasonable officer to doubt that Olson owned the backpack or would have put in doubt Olson’s ability to consent to its search,
-The facts and circumstances here were not ambiguous. ■ Nothing in the record would put a reasonable officer on notice of any duty to make additional inquiry as to *457 who had the authority to consent to the search of the closed backpack Ideated in or around the closet of Olson’s bedroom. There was repeated, unqualified consent to search authorized by Olson. - Olson clearly had the apparent authority to consent to the search of his bedroom and the contents of his bedroom. Nothing in the record shows any ambiguity in the facts requiring officers to inquire further as to the ownership of the backpack. Consent here was valid and lawful under the Fourth'Amendment and supported by numerous authorities. See, e.g., id: --The district court was correct in denying the motion to suppress.
V. The Defendant’s Claim Under the . Iowa Constitution.
Jackson also argues that the State violated his rights under article I, section 8 of the Iowa Constitution. Article I, section 8 of the Iowa Constitution provides that “[t]he right of'the-people to be secure in their persons, houses, papers ánd effects, against unreasonable seizures and searches shall not be violated.” Iowa Const, art. I, § 8. Because I would conclude that there was no violation of the Fourth Amendment to the Federal Constitution in the search conducted here, I also address Jackson’s claim under the Iowa Constitution. See Pals, 805 N.W.2d at 772 (“When, as here, a defendant raises both federal and state constitutional claims, the court has discretion to consider either claim first or consider the claims simultaneously.”).
Jackson argues this court should adopt a more stringent standard of actual authority under the Iowa Constitution than that provided by the Federal , Constitution. However, the State argues that Jackson’s claim under the Iowa Constitution was not preserved because he did not specifically argue that there should be a more stringent actual-authority standard under the Iowa Constitution.-. Jackson argues that error is preservfed for appellate review when a defendant’s pretrial motion to suppress is overruled: In the alternative, Jackson argues that, to the extent error was not preserved, his counsel was ineffective for failing to adequately argue for the adoption of an actual-authority standard under the Iowa Constitution.
Jackson’s motion to suppress states that “the search and evidence subsequently obtained violated the defendant’s rights under the 4th and 14th amendments to the United States Constitution and Article I, Section 8 of the Iowa Constitution.” The motion to suppress does not argue for any other specific application or interpretation of the Iowa Constitution that would be different than under the United States Constitution. Notably, Jackson’s motion to suppress did not specifically argue that the standard for consent to a warrantless search under the Iowa Constitution should be actual authority rather than the federal apparent-authority standard. For purposes of this dissent, I assume without deciding that error was preserved because I find Jackson’s claim that we should adopt an actual-authority standard under the Iowa Constitution to be without merit. See State v, McNeal, 867 N.W,2d 91, 99 (Iowa 2015).
1. Iowa law: Jackson argues that we should adopt a more stringent standard under the Iowa Constitution than that afforded under the United States Constitution and federal cáse law. He1 urges us to adopt a standard that would require a third party to have actual authority in order to' consent to a search of a closed container.
Article I, section 8 of the Iowa Constitution is the “nearly identical [provision] to the- Fourth Amendment to the United States Constitution.” State v. Short, 851 N.W.2d 474, 500-01 (Iowa 2014) (discussi *458 ng the differences in punctuation between the state constitution and'the Federal Constitution and how members of this .court have interpreted said differences). It provides,
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.
Iowa Const, art. I, § 8. Even when we hear “cases in which no substantive distinction had been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart.” King v. State, 797 N.W.2d 565, 571 (Iowa 2011). “Further, even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal caselaw.” State v. Kooima, 833 N.W.2d 202, 206 (Iowa 2013). However,
our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions .... What is required under the Iowa Constitution, in each and every case that comes before us, is not mere identification of a potentially analogous federal precedent, but exercise of our best, independent judgment of the proper parameters of state constitutional commands.
Short, 851 N.W.2d at 490.
Only a few states have chosen to require an actual-authority standard under their own constitutions that is more stringent than the federal apparent-authority standard. See State v. Lopez, 78 Hawai'i 433, 896 P.2d 889, 903 (1995) (holding that the individual giving consent to a search, must possess actual authority to do so under the Hawaii Constitution); State v. McLees, 298 Mont. 15, 994 P.2d 683, 691 (2000) (finding that under the Montana Constitution, “for third-party consent to be valid as against the defendant, the consenting party must have actual authority to do so”); State v. Will, 131 Or.App. 498, 885 P.2d 715, 719 (1994) (finding that it was consistent with the Oregon Supreme Court precedent to require actual authority to consent to a search under the Oregon Constitution). Both Hawaii and Montana, two states that have adopted this more stringent standard, have a search and seizure provision in their state constitution that specifically grants their citizens the right to privacy— a right not contained in the Iowa search and seizure provision. Each of those cases was decided under the concept of “invasions of privacy.” No comparable provision is contained in the Iowa Constitution. Compare Haw. Const, art. I, § 7, and Mont. Const, art. II, § 10, with Iowa Const, art. I, § 8.
Jackson also relies on the New Mexico case of State v. Wright for the proposition that actual authority is required under the New Mexico Constitution. See 119 N.M. 559, 893 P.2d 455, 460-61 (N.M.Ct.App.1995). However, the facts of that case are clearly distinguishable from the facts presented here. In that case, officers went to a trailer after receiving a tip about possible drug dealing activity. Id. at 457. They were met at the door by a woman. Id. While there was some dispute in the record as to exactly when the consent was given by the woman to look into the bedroom occupied by the defendant, there is no dispute that prior to their entry she told the officers, “Oh, it’s not my place, but go ahead.” Id. Officers proceeded to open *459 the door to the bedroom, where they discovered the defendant and drug paraphernalia. Id, at 457-58. The State attempted to argue the. woman who answered the door had apparent authority to consent to the search. Id. at 460. One of the officers testified that he did not believe, what the woman told him about the trailer not being hers. Id. However, he also stated he thought that she might have been a babysitter. Id. Relying on these facts, the State argued the officer reasonably believed that she possessed common authority over the premises. Id.[7] The court concluded that the State’s reliance on the officers’ subjective belief the woman had apparent authority to consent to the search of the residence and bedroom occu-s pied by the defendant ran counter to the provisions of article II, section 10 of the New Mexico Constitution, Id. at 460-61.[8]
I agree with this resolution and would have reached the same result under our own Constitution. But the facts in Wright are a far cry from the facts in our case and warrant a different conclusion. New Mexico accepts the minority approach under its own constitution. Id. Consent to conduct a search may also be given by someone who is clothed with common authority or possesses some other sufficient relationship concerning the premises in question. Id. at 461. In Wright, the problem was there were no additional facts that indicated the woman granting the consent had a “sufficient relationship to the premises,” and therefore, it was unreasonable for the officers to rely on her consent. Id. (quoting United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974)).. I suggest that, given the facts of our case, and even- utilizing the standards adopted by the. New Mexico court, that court would have had no problem with the consent provided by Olson.
Jackson argues that Oregon has also rejected the concept of apparent authority to the consent to a search. The Oregon Court of Appeals rejected the concept of apparent authority but stated actual authority is still required under the state constitution. Will, 885 P.2d at 719. The Oregon courts' have stated that, “[bjefore police can enter or search without a warrant in reliance on third-party consent, they must inquire and ascertain whether the consenting party has common authority; they cannot rely on subjective good faith.” Id. at 719-20. This approach is inapplicable to the facts of our case, and we have never adopted it. The Oregon case Jackson relies on deals with a minor’s authority to consent to the search of a parent’s home, a situation entirely different than the one we decide today. Id. at 720. .
However, the vast majority of states continue to apply the federal apparent-authority standard for third-party consent to a search, and many have done so under their own state constitutions. See Nix v. State, 621 P.2d 1347, 1349 (Alaska 1981); State v. Girdler, 138 Ariz. 482, 675 P.2d 1301, 1305 (1983) (en banc); Bruce v. State, 367 Ark. 497, 241 S.W.3d 728, 731 (2006); Petersen v. People, 939 P.2d 824, 831 (Colo.1997) (en banc); State v. Buie, *460 312 Conn. 574, 94 A.3d 608, 609 (2014) (per curiam); Westlake, 353 P.3d at 441; People v. Pitman, 211 Ill.2d 502, 286 Ill.Dec. 36, 813 N.E.2d 93, 107 (2004); State v. Porting, 281 Kan. 320, 130 P.3d 1173, 1178-79 (2006); Commonwealth v. Nourse, 177 S.W.3d 691, 696 (Ky.2005); Commonealth v. Porter P., 456 Mass. 254, 923 N.E.2d 36, 52 (2010); State v, Taylor, 114 Nev. 1071, 968 P.2d 315, 322 (1998) (per curiam); State v. Maristany, 133 N.J. 299, 627 A.2d 1066, 1069 (1993); State v. Gatlin, 851 N.W.2d 178, 183 (N.D.2014); State v. Linde, 876 A.2d 1115, 1125 (R.I.2005); State v. Laux, 344 S.C. 374, 544 S.E.2d 276, 277-78 (2001); Glenn v. Commonwealth, 275. Va. 123, 654 S.E.2d 910, 915 (2008); State v. Tomlinson, 254 Wis.2d 502, 648 N.W.2d 367, 375 (2002); Smallfoot v. State, 272 P.3d 314, 318 (Wyo.2012).
The Pennsylvania Supreme Court has held that it is not inconsistent with- the Pennsylvania Constitution to only require apparent authority for a third party to consent to a search. Commonwealth v. Hughes, 575 Pa. 447, 836 A.2d 893, 902-03 (2003). Unlike the Hawaii and Montana constitutional . provisions noted above, Pennsylvania’s constitutional provision, on search and seizure does not include.a right to privacy. Compare Haw. Const, art. I, § 7, and Mont. Const, art. II, § 10, with Pa. Const, art. I, § 8. Rather, Pennsylvania’s search and seizure provision is more similar in content to our own search and seizure provision. Compare Pa. Const, art. I, § 8, with Iowa Const, art. I, § 8.[9]
I agree with the states that continue to apply the apparent authority doctrine for third-party consent to a search, which is consistent with its federal constitutional counterpart. I would not find that the Iowa Constitution should be applied more stringently, as none of the authorities cited by Jackson are similar: Nor are Jackson’s authorities persuasive enough to urge the court to hold that this state should diverge from the well-established precedent under the Federal Constitution. See State v. Jorgensen, 785 N.W.2d 708, 713 (Iowa App.2009) (noting that even when a party does advance a standard for interpreting the Iowa Constitution differently, wé may sjbill interpret it using the federal analysis if we find that the defendant did not offer “sound reasons” for the distinction).
VI. Conclusion.
For all of the reasons set forth above, I would find that it was reasonable for the officers to conclude that Olson had the apparent authority to consent- to the search of the bedroom and the backpack under the federal constitution. I would decline to adopt án actual-authority standard under the Iowa Constitution as urged by Jackson. I would affirm the decision of the court of appeals, the district court ruling on the motion to suppress,- and Jackson’s convictions.
WATERMAN and MANSFIELD, JJ., join this dissent.

, Generally, one cotenant may consent to a search of a shared living area. United States v. Matlook, 415 U.S. 164, 171, 94 S.Ct 988; 993, 39 L.Ed.2d 242, 249-50 (1974). However, if one of the physically present cotenants does not consent to the search, the search is rendered "unreasonable and invalid” as to that cotenant. Georgia v. Randolph, 547 U.S. - 103, 106, 126 S.Ct. 1515, 1518-19, 164 L.Ed.2d 208, 217 (2006).

. Overnight guests may'have 'a legitimate expectation of privacy ih a host’s home. Minnesota v. Olson, 495 U.S, 91, 99-100, 110 S.Ct. 1684, 1689-90, 109 L.Ed.2d 85, 95 (1990),

. I note that our case does not involve a claim of common authority, which also distinguishes this case.

. Article II, section 10 of the New Mexico Constitution provides,
The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.
N.M. Const, art. II, § 10.

. The Pennsylvania searches and seizures provision reads:
The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.
Pa. Const, art. I, § 8.