RENDERED:  JUNE 15, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0085-MR

MARTIN ANDREW STIERITZ            APPELLANT

V.
       ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHLEEN LAPE, JUDGE
NO. 17-CR-00516

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY JUSTICE NICKELL**

**<u>AFFIRMING</u>**

A Kenton County jury convicted Martin Andrew Stieritz of complicity to attempted murder, complicity to second-degree assault, and tampering with physical evidence.  He received a total sentence of twenty years' imprisonment. Stieritz appeals to this Court as a matter of right.[1]  He raises four properly preserved allegations of error:  (1) he was entitled to a directed verdict on each of the charges for which he was convicted; (2) the trial court erred by denying his motion for mistrial based on unfair surprise; (3) he was entitled to a jury instruction on the lesser-included offense of menacing; and (4) the trial court erred by excluding mitigation evidence during the penalty phase.  Discerning no reversible error, we affirm.

---

[1] KY. CONST. § 110(2)(b).

Caitlin McVey and Breandon Johnson stopped at a gas station in Covington, Kentucky. While inside the store, Johnson and another man were involved in a verbal alteration. The verbal altercation continued into the parking lot. As McVey drove away from the store with Johnson in the front passenger seat, she noticed they were being followed by another vehicle. The other vehicle continued to follow McVey despite her efforts to evade it. Eventually, she realized they were being fired upon. McVey heard several shots. She did not initially realize she had been shot, but then felt blood dripping down her arm. In the barrage of gunfire, multiple bullets struck the interior of McVey's vehicle and three of her tires were flattened. McVey was able to pull into the parking lot of a nearby restaurant where she called the police. When police arrived on the scene, Johnson was holding pressure on McVey's gunshot wound. McVey was transported to the hospital for treatment of her injuries. Johnson left with an officer to be interviewed at police headquarters. McVey was released from the hospital the same night and returned to police headquarters to be interviewed. Police eventually recovered nine spent bullet casings from the scene.

A few hours after the shooting, Covington Police Detectives Justin Bradbury and Austin Ross received an anonymous tip implicating Coleman Lane as the shooter. Stieritz was involved in a relationship with Destiny Lane, Coleman's sister.[2] Stieritz, Destiny, and another individual lived with Coleman

---

[2] For clarity, we will refer to Coleman Lane and Destiny Lane by their first names.

2

in a residence Coleman had rented.  During their investigation, the detectives obtained information that the gun used in the shooting was located in a storage garage owned by Stieritz's parents.  During the search of the garage, Det. Bradbury went to a nearby residence owned by Stieritz's mother where he arrested Stieritz and Destiny.  As he was being arrested, Stieritz spontaneously told Det. Bradbury, "[i]t's not here."  Meanwhile, at the garage, Det. Ross discovered a black backpack with a handgun inside.  Police technicians matched bullets found at the scene to bullets fired from the handgun. Det. Bradbury interviewed Stieritz at the police headquarters.  At the time Stieritz was interviewed, Det. Bradbury knew the handgun had been retrieved by Det. Ross.  Stieritz claimed Coleman had taken the gun after the shooting before eventually admitting the gun was located in his parents' garage.  Stieritz further told Det. Bradbury where his vehicle was located.

Stieritz admitted he was driving the vehicle that followed McVey and Johnson and that Coleman had fired upon them from his vehicle.  According to her trial testimony, Destiny was seated in the front passenger seat while Coleman and Corey Richards were seated in the back.  Destiny admitted she was under the influence of methamphetamine on the night of the shooting. Stieritz testified Richards was also using methamphetamine, but denied that he or Coleman had been using drugs.

Stieritz told Detective Bradbury he placed his handgun on the center console where Coleman could access it after Destiny was yelling at him to "[j]ust do it.  Just let him [Coleman] do it."  Destiny also admitted she told

3

Stieritz to give Coleman the gun, adding she thereafter pulled her seat up, rolled the passenger seat window down, and disengaged the safety on the gun to allow Coleman to reach out and fire upon the vehicle occupied by McVey and Johnson.

A Kenton County grand jury charged Stieritz with one count of complicity to attempted murder; one count of complicity to first-degree assault; one count of second-degree assault; two counts of first-degree wanton endangerment; and one count of complicity to tampering with physical evidence.[3] The Commonwealth subsequently dismissed the two counts of wanton endangerment.[4]

Following a jury trial, Stieritz was convicted of complicity to attempted murder, complicity to second-degree assault and tampering with physical evidence. He received a total sentence of twenty years' imprisonment. This appeal followed.

## I.   TRIAL COURT PROPERLY DENIED DIRECTED VERDICTS ON ALL CHARGES

For his first contention of error[5], Stieritz argues he was entitled to a directed verdict of acquittal on each of the three charges for which he was convicted. We disagree.

---

[3] The complicity to tampering with physical evidence charge was later amended to tampering with physical evidence to conform to the evidence.

[4] The jury was nevertheless instructed on wanton endangerment as lesser included offenses.

[5] We have elected to review Stieritz's arguments in a different order than presented in his brief.

4

## A. DIRECTED VERDICT STANDARD

A directed verdict is "[a] ruling by a trial judge taking the case from the jury because the evidence will permit only one reasonable verdict." *Verdict, Black's Law Dictionary* (11th ed. 2019). CR[6] 50.01 authorizes the entry of a directed verdict as follows:

> A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

CR 50.01 applies to criminal trials by operation of RCr[7] 13.04. *Ray v. Commonwealth*, 611 S.W.3d 250, 258 n.24 (Ky. 2020).

On appellate review, a trial court's denial of a defendant's motion for directed verdict should not be reversed unless the appellate court determines "it would be clearly unreasonable for a jury to find guilt." *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). When confronted with a motion for directed verdict, the trial court must assume the truth of the Commonwealth's evidence and "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Id.* Questions regarding the weight of the

---

[6] Kentucky Rules of Civil Procedure.

[7] Kentucky Rules of Criminal Procedure.

5

evidence and the credibility of witnesses are reserved to the sole province of the jury. *Id.*

A conviction must be based on "evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* at 187-88. The Commonwealth is not required to "rule out every hypothesis except guilt beyond a reasonable doubt." *Rogers v. Commonwealth*, 315 S.W.3d 303, 311 (Ky. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)). Moreover, "[i]t is also axiomatic that the jury is not required to believe self-serving statements from the defendant or any of his witnesses." *Pollini v. Commonwealth*, 172 S.W.3d 418, 426 (Ky. 2005). This Court has further recognized, "jury instruction issues and directed verdict issues are distinct for purposes of appeal." *Sutton v. Commonwealth*, 627 S.W.3d 836, 847 (Ky. 2021). Indeed, "[t]he directed-verdict question is not controlled by the law as described in the jury instructions, but by the statutes creating the offense." *Smith v. Commonwealth*, 636 S.W.3d 421, 434 (Ky. 2021) (citation omitted). Essentially, "the question on a directed verdict motion is not necessarily what evidence supporting the defendant was solicited, but rather what evidence the Commonwealth produced in support of its burden of proof." *Sutton*, 627 S.W.3d at 848.

## B. STIERITZ WAS NOT ENTITLED TO DIRECTED VERDICT ON COMPLICITY TO ATTEMPTED MURDER

Regarding the conviction for complicity to attempted murder, Stieritz argues there was insufficient evidence either he or Coleman possessed the specific intent to kill Johnson. We disagree.

A finding of guilt by complicity requires: "(1) proof of commission of an offense by another person and (2) proof of the defendant's participation in commission of that offense." *Parks v. Commonwealth*, 192 S.W.3d 318, 327 (Ky. 2006) (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 3–3(d)(2), at 117 (1998)). An accomplice "occupies the same status as one being guilty of the principal offense." *Id.* (quoting *Wilson v. Commonwealth*, 601 S.W.2d 280, 286 (Ky. 1980)). A defendant may be convicted of guilt by complicity if the jury finds "beyond a reasonable doubt that the offense was, in fact, committed by the person being aided or abetted by the defendant." *Id.*

This Court has recognized two distinct theories of accomplice liability under KRS 502.020:

> The primary distinction between these two statutory theories of accomplice liability is that a person can be guilty of "complicity to the act" under KRS 502.020(1) only if he/she possesses the intent that the principal actor commit the criminal act. However, a person can be guilty of "complicity to the result" under KRS 502.020(2) without the intent that the principal's act cause the criminal result, but with a state of mind which equates with "the kind of culpability with respect to the result that is sufficient for the commission of the offense," whether intent, recklessness, wantonness, or aggravated wantonness . . . . The most common examples of offenses having a prohibited result are homicide, with the death of another as the prohibited result.

7

*Tharp v. Commonwealth*, 40 S.W.3d 356, 360-61 (Ky. 2000). After noting the clear applicability of KRS 502.020(2) to the crime of homicide, we further noted accomplice liability may also be imposed under 502.020(1) under the "complicity to the act" theory "if there is evidence that he/she . . . actively participated in the actions of the principal . . . with the intent that the victim's death . . . would result." *Id.* at 361.

Complicit conduct may be proven through either the existence of a basic conspiracy, or aid and counsel, or failing to make a proper effort to prevent the commission of an offense when the defendant has a legal duty to do so. KRS 502.020(1)(a)-(c); *see also* Leslie W. Abramson, *Kentucky Practice, Substantive Criminal Law*, § 3:5 (2022). The Court has interpreted the language of KRS 502.020(1) to be "broad enough to embrace acts, words, agreements, encouragement, incitement, and every form of participation in concerted criminal activity." *Young v. Commonwealth*, 426 S.W.3d 577, 582 (Ky. 2014) (quoting George G. Seelig, *Kentucky Criminal Law* § 3–3(b)(4) at 107 (2d. ed. 2008)).

KRS 507.020 defines murder in pertinent part as follows:

(1) A person is guilty of murder when:

(a) With intent to cause the death of another person, he causes the death of such person or of a third person; except that in any prosecution a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. However, nothing contained in this section shall constitute a defense to a prosecution for or

8

preclude a conviction of manslaughter in the first degree or any other crime.

The elements of criminal attempt are defined by KRS 506.010 in pertinent part:

> (1) A person is guilty of criminal attempt to commit a crime when, acting with the kind of culpability otherwise required for commission of the crime, he:
>
> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or
>
> (b) Intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime.
>
> (2) Conduct shall not be held to constitute a substantial step under subsection (1)(b) unless it is an act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime which he is charged with attempting.

Thus, to obtain a conviction for attempted murder, the Commonwealth must prove the defendant intended to kill a specific person and took "a substantial step in a course of conduct planned to culminate in" the death of that person. *Wright v. Commonwealth*, 239 S.W.3d 63, 66 (Ky. 2007), *called into doubt on other grounds by Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008). Furthermore, "[i]f a defendant intends to kill a specific victim and instead wounds an unintended victim without killing either, the defendant can be convicted of the attempted murder of the intended victim." 40A Am. Jur. 2d Homicide § 540 (2023).

A jury may infer a defendant's intent to commit a criminal offense from the surrounding circumstances. *Commonwealth v. Wolford*, 4 S.W.3d 534, 539 (Ky. 1999). Indeed, intent may be properly "inferred from the character and

9

extent of the victim's injuries." *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997)). Moreover, "[i]ntent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." *Id.*

This Court has concluded the intentional firing of multiple gunshots in the general direction of a specific person constitutes "a substantial step in a course of conduct planned to culminate" in that person's death. *Wright*, 239 S.W.3d at 66 (quoting KRS 506.010). We further held a jury could properly infer the defendant's intent from the fact one of the bullets struck the victim's arm. *Id.* at 65.

Contrary to Stieritz's suggestion, the Commonwealth was not required to produce direct evidence of intent by calling Coleman, Johnson, or any other witness to testify. The jury was also permitted to disbelieve any self-serving testimony produced by Stieritz or Destiny.

Viewing the evidence in the light most favorable to the Commonwealth and leaving questions concerning the weight of the evidence and the credibility of witnesses to the jury, we conclude the Commonwealth produced sufficient evidence to convict Stieritz of complicity to attempted murder. Stieritz witnessed the verbal altercation between Coleman and Johnson at the gas station. Stieritz followed the vehicle occupied by Johnson at Coleman's request. Stieritz continued to follow the vehicle despite McVey's attempts to

10

evade him. Although he knew Coleman was enraged at Johnson, Stieritz provided Coleman with a loaded handgun. Stieritz told police he gave Coleman the gun after Destiny yelled at him to "[j]ust do it. Just let him [Coleman] do it." Destiny also testified she told Stieritz to give Coleman the gun. On cross-examination, Stieritz admitted he knew Coleman intended to shoot at the other vehicle. Coleman fired nine shots directly at the vehicle occupied by McVey and Johnson. One of the bullets struck McVey's person and multiple bullets penetrated the interior of the vehicle. The gunfire also flattened three of the tires. After the shooting, Stieritz transported Coleman to a different location, parked his vehicle at another random location, and concealed the handgun in his family's garage. From these facts, the jury could reasonably determine Coleman possessed the requisite intent to commit attempted murder as the principal and Stieritz likewise possessed the requisite intent to be convicted as Coleman's accomplice.

### C. STIERITZ WAS NOT ENTITLED TO DIRECTED VERDICT ON COMPLICITY TO SECOND-DEGREE ASSAULT

Regarding the conviction for complicity to second-degree assault, Stieritz argues there was insufficient evidence either he or Coleman possessed the specific intent to assault McVey. We disagree.

The elements of complicity under KRS 502.020 apply equally to the charge of second-degree assault and need not be repeated. KRS 508.020 defines the elements of second-degree assault in pertinent part:

(1) A person is guilty of assault in the second degree when:

11

(a) He intentionally causes serious physical injury to another person; or

(b) He intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument; or

(c) He wantonly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument.

Like homicide, second-degree assault is an offense having a prohibited result, i.e., the intentional infliction of serious physical injury upon another person or the intentional infliction of physical injury upon another person by means of a deadly weapon. *Tharp*, 40 S.W.3d. at 361 (citing *Lane v. Commonwealth*, 956 S.W.2d 874 (Ky. 1997)); *see also* KRS 508.020.

Additionally, KRS 501.060 codifies the doctrine of transferred intent in pertinent part:

(1) Conduct is the cause of a result when it is an antecedent without which the result in question would not have occurred.

(2) When intentionally causing a particular result is an element of an offense, the element is not established if the actual result is not within the intention or the contemplation of the actor unless:

(a) The actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person or different property is injured or affected or that the injury or harm intended or contemplated would have been more serious or more extensive; or

(b) The actual result involves the same kind of injury or harm as that intended or contemplated and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.

Thus, as relevant here, the statute allows a defendant to be held liable for the murder (or lesser-included offense) of an unintended victim so long as he had

12

the requisite intent to murder his intended victim.  *See Phillips v. Commonwealth*, 17 S.W.3d 870, 874 (Ky. 2000) ("The defendant is guilty of intentional murder if he intended to kill one person (V-1), but instead killed another (V-2).").

For example, where a defendant intended to kill one specific person, but also killed three innocent bystanders in pursuit of his intended victim, this Court held the defendant was properly found guilty of four intentional murders by operation of the doctrine of transferred intent.  *Smith v. Commonwealth*, 734 S.W.2d 437, 447 (Ky. 1987).  We concluded the defendant's "intent and culpability for each of the killings were determined at the time he fired."  *Id.*  In other words, "intent follows the bullet."  40 Am. Jur. 2d Homicide § 10 (2023).

Stieritz argues there was no evidence that McVey was specifically targeted in the shooting.  However, such evidence was not necessary to support Stieritz's conviction for complicity to second-degree assault.

The evidence demonstrated Coleman possessed the requisite intent to commit the attempted murder of Johnson and Stieritz possessed the requisite intent to be convicted as his accomplice.  Under the authority stated above, the jury could properly find that the requisite facts existed as required by law to apply transferred intent.  In other words, Coleman's intent to commit the attempted murder of Johnson transferred to the second-degree assault of McVey as an unintended victim.  Likewise, by possessing the requisite intent to be convicted of complicity to the attempted murder of Johnson, Stieritz's intent

13

is deemed to be transferred to the second-degree assault of McVey as an unintended victim.

### D. STIERITZ WAS NOT ENTITLED TO DIRECTED VERDICT ON TAMPERING WITH PHYSICAL EVIDENCE

Regarding his conviction for tampering with physical evidence, Stieritz argues the Commonwealth produced insufficient evidence he intentionally concealed the handgun following the shooting. We disagree.

KRS 524.100 sets forth the elements of tampering with physical evidence as follows:

> (1) A person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he:
>
> (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding.

Stieritz cites *Commonwealth v. James,* 586 S.W.3d 717, 724 (Ky. 2019), in support of his argument insufficient evidence proved he concealed the handgun because it was "easily retrievable" by police. Stieritz further attempts to distinguish the facts of the present appeal from decisions where this Court affirmed tampering convictions. Stieritz specifically cites *Commonwealth v. Nourse,* 177 S.W.3d 691, 698 (Ky. 2005), in support of his argument that the location of concealed evidence must be "unconventional," i.e., a storm drain or a river, to support a tampering conviction.

Stieritz's reliance on *James* is misplaced. In *James,* police were investigating reports of possible drug activity at a residence. 586 S.W.3d at 719. An officer observed the defendant approaching the residence, but the

14

defendant changed directions once he spotted the officer's vehicle. *Id.* The officer then exited the vehicle and told the defendant to stop. *Id.* at 719-20. The defendant continued to walk away while keeping his hands near his waistline. *Id.* at 720. As the defendant continued to walk away, the officer observed several items fall from the defendant's waistline area onto the ground. Eventually, the defendant was placed under arrest. *Id.*

After handcuffing the defendant, the officer returned to retrieve the items that had fallen from the defendant's waistline area. *Id.* The items consisted of an empty diabetic test-strip canister and a glass pipe containing residue of a burnt substance. *Id.* Subsequent laboratory testing confirmed the substance was methamphetamine. *Id.*

The defendant was charged with first-degree possession of a controlled substance, possession of drug paraphernalia, and tampering with physical evidence. *Id.* At trial, the defendant moved for a directed verdict on the tampering charge, which the trial court denied. *Id.* The defendant was ultimately convicted on all charges. *Id.* On direct appeal, the Court of Appeals reversed and remanded with directions to grant a directed verdict of acquittal on all charges. *Id.* This Court granted discretionary review. *Id.*

We held the trial court properly denied the defendant's motion for directed verdict on the two possession charges. *Id.* at 724. Regarding the tampering charge, we held the defendant was entitled to a directed verdict. *Id.* After considering authority for other jurisdictions, this Court applied the plain meaning of the word, "conceal," as used in Kentucky's tampering statute to

15

hold the defendant's conduct "was not an act of concealment or removal sufficient to sustain an additional charge for tampering with physical evidence." *Id.* at 730.

While the defendant may have intended to conceal the evidence from police, the Court focused on the fact that the act occurred in the presence and full view of the officer and the evidence was easily retrievable. *Id.* However, the Court emphasized the narrow scope of its decision as follows:

> We caution, however, that the dropping or tossing away of evidence in the presence of a law enforcement officer, even when the drugs are eventually recovered, is not always outside the reach of the tampering statute. In some scenarios, the affirmative act of dropping or throwing away the evidence even in the presence of law enforcement officers may constitute a violation of the statute, depending on the specific facts of the case. For example, where the tossing away of evidence makes the evidence "substantially more difficult or impossible" for law enforcement to recover and use in a later proceeding against the defendant, the act may result in concealment, even if the officers ultimately succeed in retrieving the evidence. Thus, "when a defendant disposes of contraband in a manner intended to destroy the evidence or make recovery impossible, such conduct may constitute evidence tampering." By contrast, *the interpretation adopted here today applies only "where the defendant merely drops, throws down, or abandons [potential evidence] in the vicinity of the defendant and in the presence and view of the police," and in a manner that renders the evidence quickly and readily retrievable by law enforcement.*

*Id.* (emphasis added) (footnotes omitted). Thus, the *James* decision does not apply to the present appeal because there was no evidence Stieritz merely dropped, threw down, or abandoned the handgun in the presence and view of a police officer.

Further, Stieritz's attempt to distinguish *Nourse* is without merit. In *Nourse*, the defendant was sleeping at his residence when he was awakened by

16

a friend knocking at the door. 177 S.W.3d at 693. Following a brief discussion, the defendant gave his handgun to the friend and the friend left the residence. *Id.* About thirty minutes later, the friend returned to the defendant's apartment. *Id.* The defendant then left and threw the spent bullet casings down a storm drain. *Id.* The defendant was later seen washing blood off several dollar bills. *Id.* at 693-94. The defendant was charged with complicity to murder and tampering with physical evidence. *Id.* at 694.

On direct appeal, the defendant argued insufficient evidence existed that he believed an official proceeding was pending or may have been instituted at the time he disposed of the bullet casings. *Id.* at 698. The defendant further argued no evidence supported that he knew a crime had been committed until after he disposed of the casings. *Id.*

> This Court summarily rejected the defendant's arguments:

> The circumstantial evidence overwhelmingly suggests that [defendant] knowingly tampered with physical evidence when he threw the spent bullet casings down the storm drain at 2:30 a.m. after lending his gun to a friend just thirty minutes earlier. The fact that [defendant] claims he was unaware that a crime had actually occurred until after he threw the casings down the storm drain is unavailing since the jury is not required to believe self-serving statements from the defendant.

*Id.* at 698-99 (citations omitted). In *Nourse*, this Court did not address the significance of the location where evidence was placed in relation to the tampering statute.

In any event, the issue of whether physical evidence was placed in a conventional versus an unconventional location is simply one relevant

17

consideration within the context of the entire proof presented at trial. *Commonwealth v. Henderson*, 85 S.W.3d 618, 620 (Ky. 2002). The ultimate issue is whether the defendant intended "to prevent law enforcement officials from finding the evidence and using it in an official proceeding" and further completed the criminal act by destroying, mutilating, concealing, removing, or altering the physical evidence. *Id.*; KRS 524.100(1)(a).

In the present case, the evidence was sufficient to support the tampering conviction. On the night following the shooting, Stieritz and Destiny returned to their usual residence. The next night, the couple went to stay at a residence owned by Stieritz's mother. Stieritz did not habitually reside at this location. Destiny testified they went to this location to hide. Stieritz's parents owned a storage garage a few blocks away from his mother's property. Stieritz left his car parked at another random location. He then went back to the garage and put the gun inside the far-left corner. Det. Ross testified it took him between thirty minutes to an hour to locate the gun inside the garage. Stieritz initially told Det. Bradbury that Coleman had taken the gun after the shooting before admitting that he had placed it in the garage.

Based on the foregoing, the Commonwealth clearly produced more than a mere scintilla of evidence that Stieritz intended to conceal the handgun from police for the purpose of impairing its availability in an official proceeding. We conclude the trial court properly denied the motion for directed verdict.

18

## II.    TRIAL COURT PROPERLY DENIED A MISTRIAL

For his second contention of error, Stieritz argues the trial court erred by denying his motion for mistrial based on unfair surprise.  Specifically, Stieritz argues the mid-trial revelation that Johnson had been tested for gunshot residue constituted a discovery violation and the result at trial would have been different had the evidence been properly disclosed to the defense.  We disagree.

Kentucky State Police Central Forensic Laboratory analyst Benjamin Garrison testified as an expert witness on behalf of the Commonwealth on the first day of trial.  Garrison testified he analyzed a test kit for gunshot residue taken from the interior passenger door of Stieritz's vehicle.  Through his analysis of the test kit, he detected certain particles containing lead, antimony, and barium which were "characteristic" of gunshot residue from a discharged firearm.  Additionally, Garrison detected five other particles containing a combination of lead and antimony or a combination of barium and aluminum which were "consistent" with gunshot residue, but may have originated from other sources.

On cross-examination, Garrison stated he only analyzed one test kit for gunshot residue in this case.  He testified he had neither received nor analyzed any test kits taken from an individual's hands.

On re-direct, Garrison explained the hands of victims are not routinely tested for gunshot residue because it is not unexpected to detect gunshot residue on people who have been shot or have otherwise been in the vicinity of a traveling bullet.  In response to a hypothetical posed by defense counsel on

19

re-cross, Garrison stated, without being able to account for all the relevant variables, he would "imagine" a person who was behind a barrier through which a bullet had traveled would be exposed to less gunshot residue than a person who fired a gun.

On the second day of trial, Covington Police Laboratory supervising technician Dawn Bayliss testified on the behalf of the Commonwealth. After recounting the various pieces of physical evidence she collected and processed from the scene, Bayliss stated two gunshot residue test kits were collected in the case. Bayliss testified the second gunshot residue test kit was collected from Johnson. The Commonwealth asked why Bayliss did not submit the test kit collected from Johnson to the Kentucky State Police for analysis. Bayliss replied that her paperwork indicated the sample from Johnson had been submitted to the State Police. The Commonwealth then asked Bayliss, "[w]hat is your impression of why it would not have been tested by the Kentucky State Police Lab?" Stieritz objected before Bayliss answered the question. The trial court overruled the objection and allowed Bayliss to answer. Bayliss explained that a sample from Johnson was collected and sent to the State Police for analysis. She further stated the sample was analyzed and a report had been generated.

Following a brief recess for unrelated matters, the trial court conducted a conference regarding the second gunshot residue test outside the hearing of the jury. Although he acknowledged the Commonwealth did not know the test of Johnson's hands existed until Bayliss testified, Stieritz requested a mistrial,

20

arguing that he would have consulted his own expert regarding the import of the test results. Stieritz also asserted he would have changed his preparation, questioning of witnesses, and overall defense at trial had he known about the second test. Stieritz further stated a potential witness was noted in the CAD[8] 911 Log who had claimed shots were being fired from two cars.

The Commonwealth opposed the motion for mistrial. The Commonwealth reemphasized it did not know the test existed until Bayliss testified and that Bayliss had brought her own copy of the report to the courtroom. The Commonwealth further argued that no witness who had been identified or otherwise interviewed by police, including Stieritz, Coleman, and Destiny, had placed a gun in Johnson's hand on the night of the shooting. Regarding the CAD log, the Commonwealth stated the notation referenced an unidentified purported witness who claimed shots were fired from a red car and silver minivan. The Commonwealth noted there was no silver minivan involved in this case. The trial court reserved ruling and allowed the trial to continue.

The next day, Garrison was recalled as a witness by video conference, without objection. Garrison explained he did not associate the test of Johnson's hands with the Stieritz case because the test kit collected from Johnson was identified by a different case number than the test taken from Stieritz's vehicle. The analysis of Johnson's test kit revealed one particle

---

[8] Computer Aided Dispatch. While the parties discussed the contents of this log at conference, it does not appear to have been entered into evidence at trial. We have not been provided with any reference to its location in the record.

21

containing lead and antimony. Garrison explained the results were "consistent" with gunshot residue, but explained that results which are "consistent" with gunshot residue may have originated from other sources. He further testified gunshot residue may be deposited on a person who had fired a gun, handled an object with gunshot residue on it, or being in the proximity of discharging firearms.

Stieritz renewed his motion for mistrial at the close of evidence, which the trial court denied. The trial court stated Stieritz would have known if Johnson had a fired a gun at the occupants of his vehicle on the night of the shooting. The trial court further stated both parties knew a gunshot residue test kit had been collected from Johnson and both parties operated under the impression that the test kit had not been analyzed. Because Stieritz knew a test kit had been collected from Johnson, the trial court reasoned Stieritz had the opportunity to seek independent analysis regardless of whether the test kit had been analyzed by the State Police.

This Court has long recognized, "[t]here is no general constitutional right to discovery in a criminal case." *Porter v. Commonwealth*, 394 S.W.3d 382, 387 (Ky. 2011) (citing *Weatherford v. Bursey*, 429 U.S. 545 (1977)). In Kentucky, RCr 7.24 defines the scope of discovery in criminal proceedings. *Id.* Pertinent to the present appeal, RCr 7.24(1) states:

> Upon written request by the defense, the attorney for the Commonwealth shall disclose the substance, including time, date, and place, of any oral incriminating statement known by the attorney for the Commonwealth to have been made by a defendant to any witness, and to permit the defendant to inspect and copy or photograph any relevant (a) written or recorded statements or

22

confessions made by the defendant, or copies thereof, that are known by the attorney for the Commonwealth to be in the possession, custody, or control of the Commonwealth, and (b) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, that are known by the attorney for the Commonwealth to be in the possession, custody or control of the Commonwealth, and (c) upon written request by the defense, the attorney for the Commonwealth shall furnish to the defendant a written summary of any expert testimony that the Commonwealth intends to introduce at trial. This summary must identify the witness and describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

A trial court possesses "broad remedial powers" to address discovery violations.[9] *Akers v. Commonwealth*, 172 S.W.3d 414, 417 (Ky. 2005); RCr 7.24(11). These powers include the declaration of a mistrial. *Akers*, 172 S.W.3d at 417. In the context of a discovery violation, as in any other, "[a] mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity." *Cardine v. Commonwealth*, 283 S.W.3d 641, 647 (Ky. 2009) (citation omitted). The overarching purpose of our criminal discovery rules is to prevent "[a] cat and mouse game whereby the Commonwealth is permitted to withhold important information requested by the accused." *James v. Commonwealth*, 482 S.W.2d 92, 94 (Ky. 1972).

While "the Commonwealth cannot claim ignorance in order to avoid an RCr 7.24(1) violation," this Court's refusal to excuse an unintentional discovery

---

[9] We note the disclosure of the gunshot residue test at trial in this case obviates any potential violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Nunley v. Commonwealth*, 393 S.W.3d 9, 13 (Ky. 2013) ("*Brady* only applies to 'the discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense.'" (citation omitted).

23

violation does not relieve a defendant from the burden of demonstrating sufficient resulting prejudice to justify reversal. *Trigg v. Commonwealth*, 460 S.W.3d 322, 326 (Ky. 2015). Indeed, a discovery violation does not automatically mandate reversal. The reversal of a conviction for a discovery violation is warranted "only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." Akers, 172 S.W.3d at 417 (quoting *Weaver v. Commonwealth*, 955 S.W.2d 722, 725 (Ky. 1997) (internal quotations omitted)).

A discovery violation amounts to prejudicial error when the violation amounts to "a surprise attack on an unsuspecting defense counsel's entire defense strategy." *Trigg*, 460 S.W.3d at 327 (quoting *Chestnut v. Commonwealth*, 250 S.W.3d 288, 296 (Ky. 2008)). Additionally, prejudice results from a lack of adequate notice resulting in a defendant's inability to effectively challenge the veracity of evidence through cross-examination or otherwise conduct a pre-trial inquiry of other witnesses with relevant knowledge. *Id.* at 328. For example, "the prejudicial effect upon the defendant of a sudden, mid-trial revelation of what is tantamount to a confession is manifest." *Id.* at 327. We review issues concerning alleged discovery violations for abuse of discretion. *Gray v. Commonwealth*, 203 S.W.3d 679, 685 (Ky. 2006).

The *Trigg* decision dealt specifically with the nondisclosure of an incriminating statement made by the defendant in violation of RCr 7.24(1)(a). By contrast, the present appeal concerns the nondisclosure of a scientific test

24

or experiment under RCr 7.24(1)(b). Unlike the admission of the undisclosed incriminating statement in *Trigg*, the nondisclosure of the gunshot residue test did not fundamentally impair the fairness of Stieritz's trial.

In *Spencer v. Commonwealth*, 554 S.W.2d 355, 357 (Ky. 1977), this Court confronted a situation similar to the present appeal. The defendant was charged with rape and other charges relating to two separate women on separate occasions. *Id.* Prior to trial, the defendant requested production of any reports concerning the scientific testing by a Kentucky State Police laboratory technician of various bodily samples obtained from the defendant and the prosecuting witnesses. *Id.* The Commonwealth did not produce the report until the first day of trial. *Id.* The trial court allowed the laboratory technician to testify concerning the results of the tests over the defendant's objection. *Id.* The defendant was ultimately convicted of rape and other charges relating to one of the women, but he was acquitted of rape and other charges relating to the other. *Id.* at 356.

On direct appeal, the Court held the defendant had failed to establish sufficient prejudice to warrant reversal because of the untimely disclosure of the scientific reports. *Id.* at 357. The Court noted the results of the report were inconclusive with regard to connecting the defendant to the rape for which he was convicted. *Id.* Moreover, the Court emphasized the record did not "establish any intentional withholding of the report from [defendant's] counsel by the attorney for the Commonwealth." *Id.* The Court explained the report "was not made available to either side prior to trial" with "the

25

Commonwealth first becoming aware of its existence. . . the morning the trial began." *Id.*

Likewise, in *Copley v. Commonwealth*, 854 S.W.2d 748, 750 (Ky. 1993), this Court refused to reverse a conviction where certain reports produced by the coroner and an investigating officer were not disclosed to the defense prior to trial. The Court recognized the Commonwealth was unaware the reports existed and the defendant "was afforded an opportunity to review the photographs and the reports prior to the testimony." *Id.* The Court concluded "[a]ny possible error was totally nonprejudicial." *Id.* at 751.

In the present appeal, we cannot conclude the trial court abused its discretion by denying the motion for mistrial. Stieritz has failed to demonstrate the nondisclosure of Johnson's gunshot residue test amounted to an unfair surprise attack or otherwise devastated his entire defense strategy. Stieritz's entire defense was premised on a lack of specific intent. Stieritz did not claim self-defense. While he insinuated Johnson made threats at the gas station, neither Stieritz nor any other witness placed a gun in Johnson's hand on the night of the shooting.

Moreover, both parties were aware a gunshot residue test kit from Johnson had been collected. There was no evidence the Commonwealth was aware the test kit had been analyzed. Defense counsel acknowledged as much on the record. Stieritz's awareness that a test kit had been collected from Johnson negates any prejudice arising from the lack of notice because, as the trial court noted, Stieritz could have sought to have the test kit analyzed

26

independently.[10]  While the unexpected production of the report during trial was inopportune, Stieritz was nevertheless able to review its contents before any substantive testimony was taken concerning the matter on recall. Garrison ultimately explained the results of the analysis were inconclusive.[11]

Although the failure to disclose was unknowing and inadvertent, ignorance does not excuse a discovery violation because the knowledge of law enforcement is imputed to the Commonwealth.  Nevertheless, our precedents require a party to establish the result at trial would have been different had the discovery been provided.  Given the totality of the evidence, particularly the lack of any conclusive evidence Johnson fired a gun on the night in question, we are convinced the result at trial would not have been different had the gunshot residue test report been provided to Stieritz prior to trial.  Therefore, Stieritz has failed to demonstrate prejudice of sufficient magnitude to warrant reversal.

### III.   STIERITZ WAS NOT ENTITLED TO A JURY INSTRUCTION ON MENACING

For his third contention of error, Stieritz argues he was entitled to a jury instruction on menacing as a lesser-included offense to complicity to attempted murder.  We disagree.

---

[10] *Green v. Commonwealth*, 684 S.W.2d 13, 16 (Ky. App. 1984) (holding defendant's right to independent testing of evidence is implicit in RCr 7.24).

[11] We note the testimony of Det. Brian Powers who observed Johnson holding pressure on McVey's gunshot wound immediately following the shooting.

The trial court instructed the jury on complicity to attempted murder along with three lesser included offenses: facilitation to attempted murder; first-degree wanton endangerment; and second-degree wanton endangerment. Stieritz orally requested an additional instruction on the offense of menacing.

KRS 508.050 states "[a] person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." Stieritz asserted the requested instruction was required because a jury might have interpreted the evidence as establishing he merely intended to place Johnson "in reasonable fear of immediate physical injury by Coleman Lane firing a gun."

Under RCr 9.54, a trial court must "instruct the jury in writing on the law of the case." This Court has repeatedly interpreted this rule to require "instructions applicable to every state of the case deducible or supported to any extent by the testimony." *Turner v. Commonwealth*, 544 S.W.3d 610, 625 (Ky. 2018). While the trial court must instruct on every issue of fact raised by the evidence and material to the defense, the jury should be instructed on lesser included offenses "only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Holland v. Commonwealth,* 114 S.W.3d 792, 802 (Ky. 2003) (internal citations and quotation marks omitted). In other words, "the trial court has no duty to instruct on theories of the case that are not supported by the evidence." *Sanders v. Commonwealth*, 301 S.W.3d 497, 500 (Ky. 2010).

28

This Court has rejected a strict same-elements test for determining whether a defendant is entitled to a lesser offense instruction and instead adopted a fact-based approach. *Hall v. Commonwealth*, 337 S.W.3d 595, 607-08 (Ky. 2011). A trial court's refusal to provide a specific jury instruction is reviewed for abuse of discretion. *Sargent v. Schaffer*, 467 S.W.3d 198, 204 (Ky. 2015).

Relative to the present challenge, the statutory elements required to establish the offense of menacing are distinct from those demanded for proving complicity to attempted murder. Menacing requires proof of an additional element—that is, the intent to place "another person in reasonable apprehension of imminent physical injury"— which is an element not required under the murder statute. More particularly, our Court has held the firing of a weapon at an occupied vehicle is a paradigm of wanton endangerment, noting that "aimlessly firing a gun in public would be the second-degree crime and firing a gun into an occupied car would be the first-degree crime." *Swan v. Commonwealth*, 384 S.W.3d 77, 102 (Ky. 2012).

However, putting aside any legal dichotomy between the offenses of menacing and murder, we hold the record lacked sufficient proof to support an instruction regarding the lesser offense. *Iraola-Lovaco v. Commonwealth*, 586 S.W.3d 241, 248 (Ky. 2019). Here, while Stieritz testified he thought Coleman would merely "fire a round into the air, you know, and scare the guy," he also testified, "I told him [Coleman] if he was to shoot at it [McVey's vehicle], to hit the tire." On cross-examination, Stieritz admitted he knew Coleman intended

29

to fire at the vehicle occupied by Johnson. And Coleman did, in fact, fire nine shots directly at the vehicle, emptying the magazine of Stieritz's handgun. Based on the foregoing, we cannot conclude the jury could have reasonably found Stieritz guilty of menacing, but not guilty of the greater offenses. Therefore, the trial court did not abuse its discretion by refusing to instruct the jury on menacing as a lesser included offense.

## IV.    TRIAL COURT PROPERLY EXCLUDED IRRELEVANT EVIDENCE DURING PENALTY PHASE

For his fourth and final contention of error, Stieritz argues the trial court erred by excluding, as irrelevant, evidence concerning a traumatic injury he suffered following the incident giving rise to his indictment. We disagree.

During the penalty phase, Stieritz called his mother to testify concerning a traumatic brain injury he had suffered after his indictment in this case. The Commonwealth objected to this testimony as irrelevant to mitigation because the injury occurred after the commission of the crimes for which Stieritz was convicted. The trial court sustained the Commonwealth's objection.

After a jury has returned a guilty verdict in a felony case, the defendant "may introduce evidence in mitigation or in support of leniency." KRS 532.055(2)(b). This section "provides the correct standard" for determining the admissibility of mitigation and leniency evidence during the sentencing phase. *Beard v. Commonwealth*, 581 S.W.3d 537, 547 n.5 (Ky. 2019). We review a trial court's evidentiary decisions at the sentencing phase for abuse of discretion. *Lewis v. Commonwealth*, 475 S.W.3d 26, 40 (Ky. 2015).

30

"Kentucky's Truth-in-Sentencing statute is geared toward providing the jury with information relevant to arriving at an appropriate sentence for the particular offender." *Beard*, 581 S.W.3d at 547. Evidence of a defendant's motive for committing the crime is relevant to mitigation and leniency. *Id.* Penalty phase evidence need not be congruent to the evidence presented during the guilt phase; however, the evidence must be relevant. *Id.* While this Court has recognized the desirability of a "jury to have as much information before it as possible when it makes the sentencing decision, . . . such evidence must still come in under our Rules of Evidence." *Meece v. Commonwealth*, 348 S.W.3d 627, 694 (Ky. 2011) (internal quotation and citation omitted).

The terms "mitigation" and "leniency" are not defined by statute. However, KRS 532.025(2)(b) enumerates various "mitigating circumstances" that may be considered in a death penalty case. These "mitigating circumstances" concentrate on the defendant's prior criminal record, prior history, and the condition of the defendant at the time of the offense. *Id.* The reasoning underlying the mitigating circumstances under KRS 532.025(2)(b) may be instructive when considering the admissibility of evidence under KRS 532.055(2)(b) in a non-death penalty case. *Beard*, 581 S.W.3d at 548. KRS 532.025(2)(b) does not contain a comparable illustration of evidence relevant to leniency.

Leniency has been legally defined as "[t]he quality or fact of being more tolerant or merciful than expected," or "[t]he judicial act of reducing a penalty or excusing minor wrongful conduct." *Leniency, Black's Law Dictionary* (11th

31

ed. 2019).  Whether couched in terms of mitigation or leniency, the sentencing decision traditionally focuses on the defendant's culpability.  *Beard*, 581 S.W.3d at 548 (citing *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).  Culpable means censurable, blameworthy, or legally liable for a criminal act, reflecting the Latin maxim, "culpae poena par esto," meaning "Let the punishment be proportional to the crime."  *Culpable, Black's Law Dictionary* (2nd ed. 1910).  As Justice O'Connor reasoned, "the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion."  *Brown*, 479 U.S. at 545 (O'Connor, J., concurring).  Indeed, society in general as well as our precedents have long recognized "that defendants who commit criminal acts *that are attributable* to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *Id.* (emphasis added).

Neither the plain meaning of leniency nor Kentucky caselaw provide insight into the scope of evidentiary admissibility during the penalty phase of trial.  However, while not specifically mentioning leniency, KRS 532.070 authorizes a trial court to modify an "unduly harsh" sentence upon consideration of "the nature and circumstances of the crime and . . . the history and character of the defendant."  This provision illustrates the types of matters that properly concern evidentiary support for leniency.

Further, when a Kentucky and federal statute are similar, this Court has routinely looked to federal courts' interpretation of the corresponding federal

32

statute as persuasive authority. *See Kentucky New Era, Inc. v. City of Hopkinsville,* 415 S.W.3d 76, 82 n.3 (2013) ("Given the broad statutory similarities, cases construing the federal Act often inform-whether by comparison or by contrast—state decisions construing parallel provisions."). This Court has previously recognized that Kentucky's sentencing guidelines share a similar purpose with the federal sentencing guidelines. *Hoskins v. Maricle,* 150 S.W.3d 1, 23 (Ky. 2004). As such, we relied upon federal law, "both before and after the adoption of the sentencing guidelines," as persuasive authority on the question of whether "excessive leniency is an appropriate ground for rejecting a plea agreement." *Id.* at 24-25. In the absence of direct Kentucky authority on the admissibility of evidence in support of leniency under KRS 532.055(2)(b), we will likewise look to federal law for guidance.

Under federal law, a defendant's physical condition is not ordinarily relevant to the sentencing decision. Federal Sentencing Guidelines § 5H1.4 restricts the availability of downward departures based on physical condition to defendants with an "extraordinary physical impairment," such as those which render a defendant "seriously infirm." *United States v. Altman,* 48 F.3d 96, 104 (2nd Cir. 1995). Further, evidence relevant to a plea for leniency includes "the nature and circumstances of the offense, [and] the history and characteristics of the defendant." *United States v. Vonner,* 516 F.3d 382, 388 (6th Cir. 2008). Similarly, character evidence may be introduced to show a defendant is deserving of leniency when the issue is mitigation of punishment. 1 Wharton's Criminal Evidence, at 495 (13th ed. 1972).

Additionally, it is well-established that a sentencing judge may show leniency to a defendant who demonstrates remorse and who takes responsibility for his actions. *Coles v. United States*, 682 A.2d 167,169 (D.C. 1996). "A contrite defendant is considered to be more likely to benefit from rehabilitation and is, therefore, more deserving of leniency in sentencing." *El v. Artuz,* 105 F.Supp.2d 242, 255 (S.D.N.Y. 2000). Other character considerations such as employment history and family life may also be relevant to leniency. *United States v. Harris*, 339 F.App'x. 533, 537 (6th Cir. 2009). However, the Sixth Circuit Court of Appeals has cautioned against the imposition of "divergent sentences based on characteristics that are common to similarly situated offenders." *Id.* (citing *United States v. Omole,* 523 F.3d 691, 698 (7th Cir. 2008)).

Based upon the foregoing authority, we cannot conclude evidence of Stieritz's injury was relevant to his character, background, or circumstances of the offense. Moreover, while Stieritz undoubtedly experienced a traumatic injury, the record does not reflect extraordinary circumstances sufficient to overcome the presumptive irrelevance of a defendant's post-offense physical condition.

While evidence of a defendant's physical condition is not ordinarily competent to present to a jury during the penalty phase, Kentucky law factors a defendant's physical health into the sentencing decision through the mandatory presentence investigation process under KRS 532.050(2)(b). Stieritz's physical condition was explicitly considered by the trial court before

34

the imposition of final sentencing. The Supreme Court of the United States has long approved the use of presentence investigation reports to provide the sentencing authority with information concerning "every aspect" of the defendant's life. *United States v. Grayson*, 438 U.S. 41, 48 (1978) (citing *Williams v. New York*, 337 U.S. 241, 250 (1949), *superseded by statute on other grounds as stated in Barber v. Thomas*, 560 U.S. 474, 482 (2010)).

Unlike evidence of remorse, restitution, or other acceptance of responsibility, a post-offense change in the physical condition of a defendant does not ordinarily bear upon his character, background, or culpability. "Character" is defined as "[t]he qualities that combine to make an individual human being distinctive from others, esp. as regards morality and behavior; the disposition, reputation, or collective traits of a person as they might be gathered from close observation of that person's pattern of behavior." *Character, Black's Law Dictionary* (11th ed. 2019). Logically, the mental or behavioral impacts of any traumatic brain injury sustained by Stieritz *after* his commission of the crimes are irrelevant to establishing his character and culpability *at the time* the felonious acts were perpetrated, and certainly have no bearing upon his prior record or the circumstances of the offenses.

Even if such evidence may be deemed relevant to leniency, KRE 403 provides for the exclusion of otherwise relevant evidence if the probative value of the evidence is substantially outweighed by the danger of undue prejudice. *Dixon v. Commonwealth*, 149 S.W.3d 426, 431 (Ky. 2004). Evidence is unduly prejudicial if it elicits "an emotional response that inflames passions, generates

sympathy, or arouses hostility." *Id.* (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.10[4][b], at 88 (4th ed. LexisNexis 2003)). As stated above, considerations of mere sympathy and emotion should not impact the sentencing decision.

Because the proffered evidence concerning Stieritz's subsequent injury and recovery does not implicate his prior record, character, or any other circumstance of the offense, we cannot conclude the trial court abused its discretion by excluding the evidence.

Accordingly, the judgment of the Kenton Circuit Court is affirmed.

All sitting. VanMeter, C.J.; Bisig, Conley, and Lambert, JJ., concur. Keller and Thompson, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Ken W. Riggs
Assistant Attorney General